PHILIP J. MANDINA, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Mandina v. Commissioner
Docket Nos. 1068-78, 1944-78, 3565-78, 3890-78.
United States Tax Court
T.C. Memo 1982-34; 1982 Tax Ct. Memo LEXIS 713; 43 T.C.M. (CCH) 359; T.C.M. (RIA) 82034; January 28, 1982. Sidney a. Soltz, for the petitioner in docket No. 1068-78. Joel L. Wertheim, for the petitioners in docket No. 1944-78. Herman Schwartzman and Howard L. Mann, for the petitioners in docket No. *714 3565-78. Richard D. Hall, Jr. for the petitioner in docket No. 3890-78. Arnold E. Kaufman and Lawrence G. Lilly, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in income tax for the taxable year 1969 and additions to tax for that year for each of the petitioners in the above-entitled cases in the following amounts: Deficiency in
Additions to Tax [2]
Petitioners
Income Tax
Sec. 6653(b)
Sec. 6654
Philip J. Mandina
$ 637,925
$ 318,962
Roy I. O'Nan
and Madeline O'Nan
648,265
324,132
Michael A. Schaffer
and Jennifer Schaffer
674,505
337,252
Dana Mitchell, Jr.
414,392
207,196
$ 13,261
The issues for decision are (1) with respect to petitioners Philip J. Mandina, Roy I. O'Nan and Michael A. Schaffer, whether on the date of the mailing of the notices of deficiency the statute of limitations for assessment and collection of a deficiency was open under section 6501(c) because of the filing *715 by each of these petitioners of a false or fraudulent return with intent to evade tax; (2) whether any part of the deficiency in tax of each of the male petitioners is due to fraud so that the addition to tax under section 6653(b) is applicable; (3) the amount of deficiency due by each petitioner; (4) in the alternative, whether petitioner Dana Mitchell, Jr. is liable for an addition to tax for negligence under section 6653(a) and an addition to tax for failure to timely file a return under section 6651(a); and (5) whether petitioner Dana Mitchell, Jr. is liable for an addition to tax under section 6654 for failure to pay estimated tax. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner Philip J. Mandina at the time of the filing of his petition in this case resided in Miami, Florida. Petitioners Roy I. and Madeline O'Nan, husband and wife, at the time of the filing of their petition in this case resided in Miami Springs, Florida. Petitioners Michael A. and Jennifer Schaffer, husband and wife, at the time of the filing of their petition in this case resided in New Rochelle, New York. Petitioner Dana Mitchell, Jr. at the time of the *716 filing of his petition in this case resided in Henderson, North Carolina. Mr. Mandina filed his individual Federal income tax return for the taxable year 1969 with the Director of the Atlanta Service Center, Chamblee, Georgia; Mr. and Mrs. O'Nan filed their joint Federal income tax return for the taxable year 1969 with the Director of the Atlanta Service Center, Chamblee, Georgia; and Mr. and Mrs. Schaffer filed their joint Federal income tax return for the taxable year 1969 with the Director of the North Atlantic Service Center, Andover, Massachusetts. Mr. Mitchell has not filed a Federal income tax return for the calendar year 1969. Michael Schaffer met Dana Mitchell in the summer of 1968 when each of them was working for Berkshire Life Insurance Agency. Thereafter they became friends. Mr. Schaffer was introduced by Mr. Mitchell in the latter part of 1968 to Harriet Pierce. When mr. Schaffer was visiting in Miami in the latter part of 1968, he called on a classmate of his from Brooklyn Law School who was practicing law in Mr. Mandina's law firm in Miami and was introduced to Mr. Mandina. Sometime in the early part of 1969, Mr. Schaffer introduced Mr. Mitchell and Mrs. *717 Pierce to Mr. Mandina. Mr. Schaffer and Mr. Mandina are both lawyers. After finishing law school in the mid-1960's, Mr. Schaffer practiced law to some extent but was primarily engaged in business activities and was an insurance salesman for Berkshire Life Insurance Agency. Mr. Mandina is and was during all times here relevant an attorney engaged in the practice of law in Miami, Florida. During the year 1969 he practiced law in a partnership under the name of Matthews, Mandina & Lipsky. Shortly after Mr. Mitchell met Mr. Mandina, Mr. Mitchell discussed with him the formation of a corporation to be known as D. Mitchell Investments, Inc. (DMI). DMI was incorporated in the State of Florida in April 1969. Mr. Mandina drew up the necessary papers to effect the incorporation. The corporate records of DMI show that Dana Mitchell, Jr., Kay Tuccelli and Milton W. Carr, Jr. were the only officers and directors of the corporation during 1969. Ms. Tuccelli was a secretary in Mr. Mandina's office and Mr. Carr was employed by the law firm of Matthews, Mandina & Lipsky as an investigator. Mr. Carr worked primarily for Mr. Mandina and had been associated with Mr. Mandina for 8 or 9 years *718 prior to 1969. Ms. Tuccelli as not involved in any way in the decision-making process of DMI. She did not, as a director, attend meetings of the directors of DMI, although on a number of occasions Mr. Mandina dictated minutes to her of the meetings of the directors. Mr. Mandina was corporate counsel for DMI and he attended most of the directors meetings and participated in the decision-making of DMI. Mr. Schaffer was investment counsel or business advisor of DMI and he attended some of the directors meetings and participated in some of the decision-making. During 1969 and for some time thereafter, the offices of DMI consisted of one room located in the suite of offices occupied by the law firm of Matthews, Mandina & Lipsky. Roy I. O'Nan had lived in the Miami, Florida area for some time prior to 1969. During the early part of 1969 and for some time prior thereto, he worked at a restaurant in Miami which was owned and operated by Ruth Casey. The restaurant was known as Black Caesar's Forge (the restaurant). Mr. Mandina had known Mr. O'Nan for a number of years prior to 1969. In the early part of 1969, Mr. Mandina introduced Mr. Schaffer and Mr. Mitchell to Mr. O'nan. In *719 February 1969, Mr. Mitchell became interested in purchasing the restaurant. He had been to dinner there on a number of occasions with Mr. Mandina and Mr. Schaffer and had discussed the possible purchase of the restaurant with Mr. O'Nan. At the time Mr. Mitchell discussed the possible purchase of the restaurant with Mr. O'Nan, Mr. Mandina and Mr. Schaffer were with him. At that time the business of the restaurant was in some financial difficulty. Mr. O'Nan discussed with Ms. Casey the sale of the restaurant to Mr. Mitchell. An agreement was reached that Mr. Mitchell would purchase a 51 percent interest in the restaurant for $ 40,000 to $ 50,000. It was agreed that the money would be paid on an indebtedness owed by Ms. Casey rather than directly to Ms. Casey. In order to facilitate the purchase by Mr. Mitchell of a 51 percent interest in the restaurant, it was agreed that the property would be transferred to a corporation to be formed by Mr. Mandina named DuPont Properties, Inc. (DuPont) and the restaurant, which was located on six acres of land, would be transferred to the corporation. Mr. Mitchell was to be issued 51 percent of the stock in DuPont and Ms. Casey 49 percent of *720 the stock. Ms. Casey executed a deed transferring the property to DuPont. She received 49 percent of the stock of this corporation and Mr. Mitchell received 51 percent. There were mortgages on the property, and Mr. Mitchell, Mr. Schaffer and Mr. Mandina discussed with Mrs. Pierce the taking of a first mortgage on the property and advancement of sufficient funds to pay off the then-existing mortgages. Following these discussions, Mrs. Pierce, in March 1969, advanced $ 175,000 to DuPont. The $ 40,000 to $ 50,000 paid by Mr. Mitchell for his interest in the restaurant and the $ 175,000 which DuPont borrowed from Mrs. Pierce were deposited in a checking account in the name of Philip J. Mandina at the National Industrial Bank of Miami. Soon after the $ 175,000 was deposited in this checking account, Mr. Mandina made the following disbursements from the account: $ 18,500 to Roy I. O'Nan stated to be in payment of a second mortgage. $ 8,750 to Michael A. Schaffer stated to be a finder's fee. $ 6,000 to Roy I. O'Nan stated to be a finder's fee. $ 6,000 to Philip Mandina stated to be legal fees. $ 6,000 to Dana Mitchell, Jr. stated to be salary. In payment of the first *721 mortgage on the property, $ 62,000 was disbursed from this account. In payment of a second mortgage on the property, $ 15,000 was disbursed from this account to Bill Miranda. The remaining balance in the account was not disbursed in full until April 22, 1969. At the time of the disbursement of the various funds, there was no second mortgage held by Mr. O'Nan on the restaurant property. In connection with the disbursement of funds, Mr. Mandina drew a mortgage deed which recited that it was made the 13th day of February 1969 by Ruth Casey, a single woman, as mortgagor, with the space for the mortgagee being left blank.The property described in this document was the property on which the restaurant was located. This mortgage deed recited that it was to secure a loan of $ 18,500, with interest at 10 percent. The deed was brought to Ms. Casey by Mr. O'Nan, and she was told that it was necessary for her to sign it in connection with the sale of 51 percent interest in the restaurant. This mortgage deed was notarized by Milton Carr. Mr. Carr was not present when Ms. Casey signed the deed. Mr. Carr died prior to the trial of this case. Ms. Casey did not owe any money to Mr. O'Nan *722 and he did not advance any money to her at the time she signed the mortgage deed reciting that she had received $ 18,500. In April 1969, after the formation of DMI, Ms. Casey sold her 49 percent interest in DuPont to DMI. The sale was arranged primarily by Mr. O'Nan, but Ms. Casey did have some discussion with respect to the sale with Mr. Mandina. She also met Mr. Schaffer briefly in the office of Mr. Mandina when this sale was being discussed. The legal documents with respect to the purchase of the remaining interest in the restaurant were prepared in Mr. Mandina's law office and some of them were prepared by Mr. Mandina. Ms. Casey saw Mr. O'Nan obtain documents from Mr. Mandina and Mr. Schaffer and later Mr. O'Nan brought documents to her to sign. Mr. O'Nan told Ms. Casey she would receive $ 100,000 for the sale of her 49 percent interest in DuPont to Mr. Mitchell. DMI drew four checks, Nos. 101 through 104, made payable to Ruth Casey. One of the checks was in the amount of $ 100,000, another in the amount of $ 50,000, and two in the amount of $ 25,000 each. The $ 100,000 check and the $ 50,000 check were each dated April 21, 1969. One of the $ 25,000 checks was dated *723 April 29, 1969, and the other May 9, 1969. The four checks were brought to Ms. Casey by Mr. O'Nan on April 25, 1969, and she endorsed all four of them. She then went to the bank with Mr. O'Nan on April 25, 1969, her birthday, and the $ 100,000 check and the $ 50,000 check were cashed. Ms. Casey used $ 90,000 of the $ 100,000 check to purchase a cashier's check made to her order and obtained $ 10,000 in cash. Ms. Casey received no other amount from the four checks which she endorsed. While in the bank on April 25, 1969, Ms. Casey observed Mr. O'Nan receiving some cash after presenting a check which she believed to be one of the checks she had endorsed. The $ 25,000 check dated April 29, 1969, which Ms. Casey endorsed was cashed at the National Industrial Bank of Miami, on April 30, 1969, and the $ 25,000 check dated May 9, 1969, was cashed at the National Industrial Bank of Miami on May 9, 1969. Mr. Mandina told Ms. Casey that she should be happy to receive $ 100,000 for the sale of her 49 percent interest in DuPont. It later developed that Ms. Casey did not in fact have the legal title to the restaurant property, but that the property was in the name of a corporation, B.C.F. *724 Inc., of which Ms. Casey owned all the stock. In July 1971, Mr. Mandina prepared a warranty deed dated the 21st day of April 1969 whereby B.F.C. Inc. transferred the restaurant property to DMI. The deed whereby Ms. Casey transferred the restaurant property to DuPont had never been recorded. The deed by B.C.F. Inc. transferring the restaurant property to DMI was recorded on July 20, 1971. Mr. O'Nan continued to manage the restaurant until about Auguat 1969 when the restaurant was closed. During the months of April through December 1969, Mr. O'Nan received a total amount of $ 18,000 as salary from DMI. Mr. O'Nan participated in making decisions with respect to DMI. The books of DMI showed its investment in the restaurant to be $ 200,000. In April 1969, when DMI was formed, Harriet H. Pierce transferred over $ 2,600,000 in stock and securities to the corporation. After the formation of DMI, DuPont was merged into that corporation. On June 21, 1969, Mr. Mitchell and Mrs. Pierce were married in Dade County, Florida.On the date preceding the marriage, Mr. Carr issued a DMI check in the amount of $ 400,000 to Mrs. Pierce. Mrs. Pierce deposited the $ 400,000 check of DMI in *725 her personal checking account and then issued two checks, one in the amount of $ 300,000 payable to cash and one in the amount of $ 100,000 payable to Dana Mitchell, Jr. The $ 300,000 check issued by Mrs. Pierce was exchanged for a cashier's check drawn on her bank on June 20, 1969, the date that it was issued, and on the same date the cashier's check was converted into currency at a different bank. The $ 100,000 check drawn to Mr. Mitchell was deposited in his personal checking account. The records of DMI show that Mr. Mitchell received a loan of $ 100,000 from DMI in May 1969. The minutes of the corporation state that Mr. Mitchell would transfer 75 percent of the stock of DMI to the corporation as security for his loan. Initially, Mr. Mitchell had been issued all of the outstanding stock of DMI composed of four certificates. At some date, three of these certificates were endorsed in blank by Mr. Mitchell. Certificate No. 1, which was not endorsed in blank, has on it the initials, in parentheses, "DM." Certificate Nos. 2, 3 and 4, which were endorsed in blank by Mr. Mitchell, have in parentheses on them "MS," "PM," and "RO." Shortly after receiving the $ 100,000 from DMI, *726 which was recorded on the records of the corporation as a loan, Mr. Mitchell purchased from Mr. Mandina a 55-foot Wheeler yacht for $ 65,000 and a 17-foot Thunderbolt boat for $ 1,700. Mr. Mitchell transferred $ 97,000 to Mr. Mandina shortly after receiving the $ 100,000 recorded as a loan on DMI's books and purchasing Mr. Mandina's 55-foot Wheeler yacht and the 17-foot Thunderbolt boat. Shortly thereafter Mr. Mandina purchased a new yacht for $ 93,000. Mr. Mandina's basis in the 55-foot Wheeler yacht was $ 50,200 at the time it was sold to Mr. Mitchell and his basis in the 17-foot Thunderbolt boat was $ 1,355.50 at the time it was sold to Mr. Mitchell. The records of DMI show that on October 15, 1969, all its common stock was issued to Mr. Mitchell and all its preferred stock, consisting of certificates 1 through 4, was issued to Harriet H. Pierce Mitchell. As of March 31, 1970, the $ 100,000 shown on the books of DMI as a loan to Mr. Mitchell was written off as a bad debt by DMI. On August 11, 1969, Mr. Mitchell signed a DMI check in the amount of $ 260,000 made payable to the National Industrial Bank of Miami. This check was converted into currency at that bank. The check *727 carried no endorsement but merely showed the bank's stamp on the back. The DMI check for $ 260,000 was shown on DMI's records as the purchase price of 344,500 shares (a 53 percent interest) in the stock of Sooner State Oil Co., Inc. (Sooner). In the early part of June 1969, Mr. Schaffer had discussed with Mr. Mitchell seeking out a publicly held shell corporation to purchase on behalf of DMI. Mr. Schaffer had located Sooner, which was a public corporation with no assets or liabilities. Mr. Schaffer negotiated the purchase of 344,500 shares of stock of this shell corporation for $ 35,000. On August 8, 1969, Stefano Bandino (correctly, Brandino) signed a document which purported to be a contract to buy 344,500 shares of stock of Sooner for $ 35,000. Sometime prior to August 11, 1969, Mr. Schaffer met with Mr. Brandino in the office of Mr. Mandina. Mr. Schaffer, Mr. Mitchell and Mr. Mandina were all present in the office of Mr. Mandina at the time Mr. Brandino signed the legal documents relating to the acquisition of Sooner stock. These documents show a purchase by Mr. Brandino of the 344,500 shares of Sooner stock for $ 35,000 and the sale of that stock to DMI for $ 260,000. Mr. *728 Brandino received a payment of $ 3,000 for signing these various documents in connection with the Sooner stock sale. The closing of the sale of the 344,500 shares of Sooner stock was effected by Mr. Schaffer. The $ 35,000 price of the stock was paid in currency which Mr. Schaffer carried to the closing in a paper bag. Mr. Brandino, in 1969, was an Italian national living in the Bahamas and managing a restaurant there.Mr. Mandina had met him when he had been in the Bahamas and he had become a friend of Mr. Mandina's and, at times, a client.
In May 1969, Ms. Terry Timme (now Mrs. Terry Timme Kabbaby) was a call girl. Another call girl who was a friend of hers received a call from Mr. Mandina to come down to his yacht. Ms. Timme accompanied her friend to the dock, intending to return to where they both lived. However, Mr. Mandina introduced Ms. Timme to Mr. Mitchell and she stayed and visited with him while her friend went with Mr. Mandina to see his new boat. The next day, Mr. Mitchell called Ms. Timme and she met him and began a relationship with him which lasted through the remainder of 1969. Mr. Mitchell arranged for an apartment for Ms. Timme at the Jockey Club, where he *729 and Ms. Timme very often would spend the entire day. In October 1969, approximately a week before Halloween, Mr. Schaffer came to the apartment at the Jockey Club where Ms. Timme and Mr. Mitchell were. He was carrying a briefcase. He opened the briefcase and Ms. Timme saw that it contained currency. Mr. Mitchell and Ms. Timme counted the currency in the presence of Mr. Schaffer and found that the amount was in excess of $ 200,000, perhaps as much as $ 225,000 or $ 229,000. Mr. Schaffer left the apartment and left the currency. Both Mr. Mitchell and Ms. Timme stayed in the apartment the remainder of the day and through the night. Very early the next morning, Mr. Schaffer returned to the apartment and later in the morning Mr. Mandina and Mr. O'Nan came to the apartment. Messrs. Mandina, O'Nan, Schaffer and Mitchell discussed something with respect to a shell company. During the course of the conversation one of them made reference to taking the currency to the office of Mr. Mandina. Later in the morning, Mr. Mandina put the currency in a briefcase he had brought to the apartment and left the apartment carrying the briefcase containing the currency. Most of the discussion was between *730 Mr. Schaffer and Mr. Mandina, with Mr. O'Nan and Mr. Mitchell saying very little. Sometime in July 1969, Mr. Mandina called Ms. Timme and told her that she should follow his instructions with respect to continuing her relationship with Mr. Mitchell. He stated to her that the $ 1,000 weekly amount she was receiving from Mr. Mitchell was "chicken feed" compared to the possible sum which could be obtained from Harriet Pierce Mitchell. Mr. Mandina told Ms. Timme that he was "in control of" Mr. Mitchell and that he, Mr. Mandina, was running the whole show. At various times during the fall of 1969, Mr. Mitchell would state to Ms. Timme that he was unhappy in his marriage to Harriet Mitchell and wanted to go to her and "tell her what was going on and get out." Mr. Mitchell would call Mr. Mandina on the telephone and Ms. Timme would hear the conversation since Mr. Mitchell would hold the phone a little away from his ear and she could hear Mr. Mandina yelling at Mr. Mitchell on the telephone. These calls became more frequent the first part of December. Mr. Mandina would tell Mr. Mitchell to "quit being such a big baby." One day in December, Mr. Mandina called Ms. Timme and told her that *731 Mr. Mitchell had signed some papers and that "unless he continued as he was" he could go to jail. Several times Mr. Mandina brought papers over to the apartment and Mr. Mitchell signed them without reading them. The day Ms. Timme was in Mr. Mandina's office, she heard him make a comment with respect to an insurance company that he, Mr. Mandina, never put his name on any papers. During the late fall of 1969, Mr. Mitchell stated to Ms. Timme that although he had married Harriet Mitchell for her money and was unhappy in the marriage and wanted out, he had to stay until the shopping center was done because Mr. O'Nan was to order pipes and things for the shopping center that would be a different price from the price he ordered them for, and that was how they were going to take the money. He said they would buy the pipes for one price, but show on the books that they had bought them for another price--and that was how they would get money from the shopping center. Mr. Mitchell took Ms. Timme out to property on 36th Street and showed her where the shopping center was to be built. On May 16, 1969, DMI check No. 133 in the amount of $ 17,000 was drawn, payable to Michael Schaffer. This *732 check was deposited in the personal bank account of Mr. Schaffer. Initially, on the books of DMI the $ 17,000 was treated as an advance to "Michael A. Schaffer individually." Later it was shown as an advance to "Brian and Mikes." The $ 17,000 was never repaid to DMI and was subsequently written off as a bad debt. Mr. Schaffer and his wife owned 75 percent of the stock of a corporation known as Brian and Mikes. The remaining stock was held in the name of a third party. Mr. Schaffer wrote a letter to Mr. Mandina with respect to the $ 17,000. On November 25, 1969, Mr. Schaffer, on behalf of Brian and Mikes, Inc., entered into a contract whereby all the assets of Brian and Mikes were sold to a third party for $ 57,000. Brian and Mikes' obligation to 332 Restaurant, Inc. was assumed by the third party purchaser of the assets, but no other obligations were assumed. DMI took no action attempting to collect the $ 17,000 loan. On August 12, 1969, Mr. Mitchell issued a DMI check in the amount of $ 30,000, payable to Mr. Schaffer. The $ 30,000 was treated on the books of DMI as a "loan to Michael A. Schaffer." In 1971, an entry was made on the books of DMI offsetting the loan and showing *733 it as being offset against a $ 30,000 attorney fee owed to Mr. Schaffer. In 1969, DMI issued three checks totaling $ 125,000 which were deposited by Mr. Schaffer. The first check, dated August 19, 1969, in the amount of $ 20,000, was made payable to Mr. Schaffer and was endorsed by him and deposited in his personal bank account. The second check, dated September 3, 1969, for $ 35,000, was made payable to Mr. Schaffer and was endorsed by him and deposited in his personal bank account. The third check, dated November 25, 1969, in the amount of $ 70,000, was made payable to the order of BLW International Film Shorts and Features Ltd. (BLW Film). This check was endorsed by Mr. Schaffer as treasurer of BLW Film and deposited in the account of BLW Film. The August 19, 1969, check for $ 20,000 was signed on behalf of DMI by Mr. Mitchell, and the September 3, 1969, and November 25, 1969, checks were signed on behalf of DMI by Milton W. Carr, Jr. The $ 20,000 check was originally shown on the books of DMI as a loan to Mr. Schaffer, but was subsequently shown as an advance to Sooner. The $ 35,000 check made payable to Mr. Schaffer was treated on the books of DMI as an advance to BLW *734 Film. In 1970, at the instruction of Mr. Schaffer, the DMI accountant, Mr. George Levie, made an adjusting journal entry on the books of DMI charging $ 51,000 of the sum represented by the three checks of DMI totaling $ 125,000 as bad debts of Sooner. As of May 11, 1970, the corporate records of DMI did not contain any notes receivable relative to the $ 17,000 or the $ 30,000 shown as loans to Mr. Schaffer or Brian and Mikes, or the $ 125,000 amount shown as loans to Mr. Schaffer or BLW Film. No documentation of these transactions was furnished to DMI even though such documentation was requested by DMI's accountant through June of 1970. BLW Film was a corporation engaged in entering into contracts with respect to the sale of film. In March 1970 it was still entering into contracts with shipping firms and as late as April 1970 was shipping film to customers. BLW Film was not dissolved until December 15, 1973.
On October 10, 1969, Mr. Carr signed a DMI check in the amount of $ 53,000 made payable to Margaret Machen. Mr. Carr accompanied Ms. Machen to the bank on October 10, and the $ 53,000 check was cashed and Mr. Carr put the currency in a briefcase he was carrying. The *735 amount of $ 15,000 of the currency was delivered to a representative of Trans-Florida Assurance Agency, Inc. (Trans-Florida) to pay accumulated corporate obligations. Ms. Machen owned some stock in Trans-Florida which she transferred to DMI. After going to the office of Trans-Florida, Ms. Machen and Mr. Carr went back to the offices of Matthews, Mandina & Lipsky. Ms. Machen went in to visit with Carey Matthews, who was her nephew. She mentioned the $ 38,000 in currency and Mr. Matthews prepared a receipt in handwriting for Mr. Carr to sign with respect to the $ 38,000. DMI showed an investment in Trans-Florida on its books as $ 192,727.48, which included the check for $ 53,000 made payable to Ms. Machen. This entire investment of DMI in Trans-Florida was written off as worthless as of March 31, 1970. Mr. Carr testified before a grand jury that he gave the $ 38,000 in cash to Mr. Matthews. He was indicted for perjury in connection with this testimony and was tried on this charge and acquitted. On December 3, 1969, DMI issued a check for $ 60,000 to Mr. Mitchell. On the following day that check was converted into currency. The check was endorsed first with the name "Dana *736 Mitchell, Jr." and under Mr. Mitchell's name it was endorsed in the name "Milton A. Carr, Jr." In the upper righthand corner of the check appeared a notation "loan." On the books of DMI the $ 60,000 was initially shown as an escrow item in Mr. Mitchell's account. Subsequently it was reclassified as being for purchase of Sooner stock, and finally it was written off as worthless as a part of DMI's investment in Trans-Florida. In the summer of 1969, a brother of Mr. Mandina, Jerry Mandina, was employed by DMI. He was paid a salary by DMI and it was intended that he would assist Mr. O'Nan in some way in connection with the development of a shopping center on 36th Street. In early January 1970, Mr. Mitchell left Miami and did not return. After Mr. Mitchell left, Jerry Mandina was made president of DMI for a period of time. During the course of a divorce proceeding brought by Mrs. Harriet H. Pierce Mitchell against Mr. Mitchell, an accountant went over the records of DMI and made a number of summaries and analyses therefrom. Sometime in 1970 Mr. and Mrs. Mitchell were divorced. Findings Relating Only to Mr. Philip J. Mandina
On June 19, 1969, Margaret W. Mandina, the mother *737 of Philip J. Mandina, petitioner in this case, but whose husband also was named Philip J. Mandina (his name being Philip Joseph, whereas petitioner's name was Philip James), obtained a safe deposit box at the Broward National Bank. On June 23, 1969, that box was closed and Margaret Mandina and petitioner Philip J. Mandina jointly opened a safe deposit box at the same bank. Petitioner's mother and father were retired as teachers from the New York City school system about mid-1967. They then moved to Florida. Margaret Mandina did not receive any retirement benefits from the school system, but her husband received such benefits until his death. On January 30, 1967, petitioner's mother and father applied for a loan to be secured by an apartment in Ft. Lauderdale, Florida. On the loan application they showed the salary of petitioner's father as $ 11,500 and the salary of petitioner's mother as $ 7,300 and income from securities of $ 300, making a total annual income of $ 19,100. Under assets they showed a total of $ 49,286.55, consisting of savings accounts of $ 8,300, stocks and bonds of $ 3,653, an automobile worth $ 800, furniture and personal assets of $ 3,000, a house located *738 in South Miami with a value of $ 6,533.55 and amounts contributed to the New York City Board of Education pension fund of $ 27,000. The only liability shown was a mortgage payable to J. I. Kislak Mortgage Corp. of Florida of $ 9,366.45. Petitioner had an envelope containing cash in the joint safe deposit box with his mother.His mother did not know the amount of cash contained in the envelope and believed that her son had placed it in the safe deposit box because he was in the process of obtaining a divorce from his wife. Petitioner Philip J. Mandina did obtain a divorce from his wife in the year 1969. Petitioner Mandina maintained a joint checking account with his mother at the Ocean National Bank, Ft. Lauderdale, Florida.Cash deposits were made to this account on May 1, 1969, May 5, 1969, and May 9, 1969, in the amounts of $ 14,000, $ 300 and $ 1,000, respectively. On May 2, 1969, May 5, 1969, and May 19, 1969, $ 3,000, $ 7,000 and $ 5,000, respectively, were disbursed from this account to Mr. Mandina. The $ 3,000 disbursed on May 2, 1969, was paid by petitioner Mandina to a dentist as part payment on a dental bill of his wife which he was required to pay during the course *739 of their divorce proceeding. The other two amounts were deposited to Mr. Mandina's personal checking account at the Little River Bank and Trust Co. Petitioner Mandina and his mother maintained a joint checking account at the Broward National Bank. The following schedule shows currency deposits made to the bank account at the Broward National Bank, Ft. Lauderdale, Florida, in the joint names of petitioner Philip J. Mandina and his mother: August 4, 1970
$ 500.00
October 7, 1970
12,000.00
December 4, 1970
15,000.00
1970 Total
$ 27,500.00
January 5, 1971
$ 195.87
January 25, 1971
197.97
February 23, 1971
1,000.00
April 5, 1971
76.70
April 23, 1971
1,000.00
July 13, 1971
1,400.00
July 26, 1971
1,000.00
August 2, 1971
400.00
August 5, 1971
94.40
August 19, 1971
21,500.00
September 27, 1971
900.00
October 14, 1971
2,000.00
November 8, 1971
100.00
1971 Total
$ 29,864.94
July 13, 1972
$ 600.00
October 3, 1972
100.00
1972 Total
$ 700.00
The following schedule shows the record of entries to the joint safe deposit box held in the names of Margaret W. Mandina and petitioner Philip J. Mandina at the Broward National Bank during the *740 years 1970 through 1973: Record of Visits--Safe Deposit
Aug. 4, 1970
June 6, 1972
Apr. 1973 *
1970 *
Nov. 3, 1972
Apr. 27, 1973
Nov. 23, 1970
Nov. 22, 1972
May 8, 1973
Dec. 4, 1970
Dec. 1, 1972
May 22, 1973
Dec. 7, 1970
Dec. 5, 1972
1973 *
Jan. 5, 1971
Jan. 4, 1973
Sep. 17, 1973
Jan. 1971 *
Jan. 22, 1973
Oct. 24, 1973
July 1971 *
Feb. 5, 1973
Nov. 29, 1973
1971 *
Feb. 9, 1973
Dec. 13, 1973
Aug. 1971 *
Feb. 26, 1973
Dec. 28, 1973
Jan. 25, 1972
1973 *
On October 7, 1970, a check payable to petitioner Mandina for $ 12,000 was drawn on the joint account of petitioner Mandina and his mother at the Broward National Bank. Petitioner Mandina's name was shown as Philip J. Mandina, Jr. on the check. On December 4, 1970, a $ 15,000 check was drawn on this account to Mr. O'Nan. Petitioner Mandina deposited the $ 12,000 check drawn on the joint account he maintained with his mother at the Broward National Bank to his personal checking account at the Coconut Grove Bank. The check drawn to Mr. O'Nan was endorsed and negotiated for currency. The currency deposit of $ 21,500 made to the account of petitioner *741 Mandina and his mother on August 19, 1971, was for the purpose of having a check drawn to a John Bolesky as part purchase price of a Bertram yacht bought by petitioner Mandina. A check for $ 21,500 drawn on this account shortly after August 19, 1971, was made payable to Mr. Bolesky and applied toward the purchase of the yacht by petitioner Mandina. A further part of the purchase price of this yacht was made with a $ 10,000 cash payment. In September 1969 petitioner paid cash in the amount of $ 6,013.72 towards the purchase he made of a 1969 Jaguar. In 1969 he lent his law firm currency of $ 6,500. During 1970 petitioner paid currency of $ 732 toward the purchase of a motorcycle and in 1971 paid currency of $ 3,231 toward the purchase of a 1971 Corvette. On August 19, 1969, petitioner Mandina opened a stock brokerage account at Walston & Co. as custodian for his son, Joseph Mandina, and also opened an account in the name of Stefano Bandino (correctly Brandino) over which he had direction. On August 20, 1969, petitioner Mandina and his mother opened a joint stock brokerage account at Walston & Co. The account opened in the name of Mr. Brandino showed petitioner Mandina's office *742 address and his telephone number as the address of the account. Currency deposits of approximately $ 22,000 were made to this account in 1970. A joint account in the name of petitioner Mandina and Mr. Brandino was opened at the Coconut Grove Bank, and an account in the name of Mr. Brandino was opened at the National Industrial Bank of Miami. Of the funds withdrawn from Mr. Brandino's brokerage account at Walston & Co. in 1970, $ 32,000 was deposited in the National Industrial Bank of Miami account and disbursed for the benefit of petitioner Mandina. During 1969, petitioner Mandina paid currency of $ 4,400 to the Aggressor Yacht Company, deposited $ 2,800 in a joint account he had with his then wife, Kitty Darling Mandina, at Little River Bank & Trust Company, and $ 3,350 in a joint account he had with her at Coconut Grove Bank. He also deposited $ 18,000 of currency in an account he held jointly with Kitty Mandina at Walston & Co. On September 17, 1970, Mr. Carr and petitioner rented a safe deposit box jointly at the Coconut Grove Bank. Entries were made into this box as shown in the following schedule on the dates indicated: Visitation Record
Date and Hour
Signature
1:30 Sep. 17, 1970
M. W. Carr, Jr.
12:31 Dec. 10, 1970
M. W. Carr, Jr.
12:25 Dec. 15, 1970
M. W. Carr, Jr.
1:21 Dec. 21, 1970
P. J. Mandina
Philip J. Mandina
2:01 Jan. 5, 1971
M. W. Carr, Jr.
11:50 Jan. 6, 1971
M. W. Carr, Jr.
1:25 Jan. 15, 1971
M. W. Carr, Jr.
11:59 Jan. 28, 1971
Philip J. Mandina
10:17 Feb. 4, 1971
M. W. Carr, Jr.
1:53 Feb. 5, 1971
M. W. Carr, Jr.
10:27 Feb. 8, 1971
M. W. Carr, Jr.
1:02 Feb. 22, 1971
M. W. Carr, Jr.
12:26 Feb. 24, 1971
M. W. Carr, Jr.
11:37 Mar. 23, 1971
M. W. Carr, Jr.
12:36 May 7, 1971
M. W. Carr, Jr.
10:13 May 13, 1971
M. W. Carr, Jr.
11:09 June 3, 1971
M. W. Carr, Jr.
10:49 Nov. 10, 1971
M. W. Carr, Jr.
12:33 Nov. 10, 1971
Philip J. Mandina
12:37 1972 *
Philip J. Mandina
12:30 Aug. 30, 1972
M. W. Carr, Jr.
*743 In March 1971 petitioner Mandina purchased a personal residence at Ocean Reef Club, North Key Largo, Florida. He made a payment on the purchase price by check of $ 8,100 on March 17, 1971, and a payment on the purchase price of $ 20,034 on June 17, 1971. The total purchase price of the property was $ 86,585.60. On October 18, 1971, the amount of $ 1,992.66 was paid in currency for carpeting installed in the residence. The only deposits made to the joint account of Mr. Brandino and petitioner Mandina at the Coconut Grove Bank were checks coming from Walston & Co. and a $ 341 transfer from the National Industrial Bank of Miami in December 1970. The only checks charged to this account were a check dated December 23, 1970, for $ 15,000 to Walston & Co. and two checks made payable to the law firm of Matthews, Mandina & Lipsky in March 1971 and June 1971 in the respective amounts of $ 10,000 and $ 19,034. These two checks were deposited to the law firm's trust account at the Coconut Grove Bank. The deposits made to the trust account at the Coconut Grove Bank were all distributed either to petitioner Mandina or to an escrow account of the Ocean Reef *744 Realty Corporation from which he purchased his North Key Largo house. The checking account in the name of Mr. Brandino at the National Industrial Bank of Miami which was opened with a $ 100 deposit on August 12, 1969, had no other deposits made thereto except two checks from Walston & Co., one in the amount of $ 15,000 and the other in the amount of $ 17,000. The following schedule shows the dates of the checks, the amounts of the checks and the payees of disbursements from this account at the National Industrial Bank of Miami: Check Date
Amount
Payee
June 1, 1970
$ 14,500
Milton W. Carr, Jr.
June 3, 1970
5,000
Philip J. Mandina
June 25, 1970
7,000
Walston & Co.
July 20, 1970
3,500
Aggressor Yacht Co.
August ?, 1970
1,750
Unknown--check missing
December 4, 1970
341
Cash
Total
$ 32,091
For the calendar year 1968, petitioner Mandina filed a joint Federal income tax return with his then wife, Kitty Darling Mandina. Total income of $ 42,918 was reported on this return as "other income." This income was arrived at by substracting from an amount of $ 61,356 shown under the designation "Pensions and annuities, rents and royalties, etc.," a loss *745 of $ 18,472 from petitioner's individual practice of law. Petitioner elected income averaging on this return and showed the following taxable income for the years 1964 through 1967: 1964
$ 6,527
1965
18,435
1966
14,403
1967
19,667
Mr. Mandina hired a captain for his yacht. A portion of the captain's salary in the amount of $ 5,810.49 was paid by check drawn on the account of the law firm of Matthews, Mandina & Lipsky. Also, DMI purchased a plane during 1969 which was subsequently involved in a trade in which Mr. Mandina obtained a plane in his personal name. On October 31, 1969, Mr. Mandina received a check for $ 6,000 from DMI, and on November 25, 1969, received a $ 3,000 check from DMI. Both of these checks were deposited by Mr. Mandina in his personal checking account. Findings Related Specifically to Dana Mitchell, Jr.
Dana Mitchell, Jr. received at least $ 18,000 from checks drawn to Ruth Casey that were entered on the books of DMI as payments for the restaurant. Mr. Mitchell received $ 18,000 as salary payment in 1969. Mr. Mitchell received cash of at least $ 4,000 which he considered to be a distribution relative to the Trans-Florida transaction *746 with Ms. Machen. Mr. Mitchell considered himself to be in a partnership with Mr. Schaffer, Mr. O'Nan and Mr. Mandina with respect to DMI transactions. He did not attend board of directors meetings in a number of instances where the minutes of the board reflected him as being in attendance. He considered the cash which he received from checks drawn by DMI in connection with the purchase of the restaurant to be his share of "plot profit" representing money which was to be taken out of DMI for the benefit of himself and the individuals he considered his partners. Findings Relating to Each Petitioner's Reporting of Income and the Commissioner's Determination
On his 1969 Federal income tax return, Mr. Mandina reported adjusted gross income of $ 17,055 composed of a net loss from his individual practice of law of $ 4,085, deductible capital loss of $ 1,000, and partnership income (Matthews & Mandina) of $ 22,140. The only income reported on the joint Federal income tax return of Mr. and Mrs. O'Nan was wages of $ 16,000. On the joint Federal income tax return of Mr. and Mrs. Schaffer an adjusted gross income of $ 30,831.62 was reported composed of net profit from individual *747 practice of law of $ 19,180.85, short-term capital gain of $ 8,525.77, and partnership income (Schaffer & Lewine) of $ 3,125. Since Mr. Mitchell filed no Federal income tax return for 1969, he reported no income. Respondent, in his notice of deficiency to each of petitioners Mandina, Schaffer and O'Nan, increased their reported income by an amount designated "other income" which in each instance included the following items: (1) Partial proceeds of purported purchase price of
Black Caesar's Forge by D. Mitchell Investments,
Inc. Diverted by you.
$ 100,000
(2) Proceeds of check from Harriet H. Pierce dated
June 20, 1969 diverted by you.
300,000
(3) Net proceeds from sale of stock in Sooner State
Oil Co., Inc. to D. Mitchell Investments, Inc.
diverted by you.
225,000
(4) Net proceeds of checks issued by D. Mitchell
Investments, Inc. diverted by you as follows: 8/19/69 # UNKNOWN $ 20,000
9/ 3/69 #248 35,000
11/25/69 #374 70,000
Total
$ 125,000
(5) Partial proceeds of D. Mitchell Investments,
Inc. check No. 292 in the amount of $ 53,000
diverted by you.
38,000
(6) Proceeds of D. Mitchell Investments, Inc.
check No. 396 dated December 3, 1969
diverted by you.
60,000
*748 Respondent also determined that the exact same amount of unreported income, except for the $ 300,000 check from Harriet H. Pierce dated June 20, 1969, was received by petitioner Dana Mitchell. In addition, respondent determined that Mr. Mandina received $ 30,300 from Mr. Mitchell in connection with the purchase and sale of his yacht and boat, $ 5,156.50 as plane expenses, a taxable capital gain from the sale to Mr. Mitchell of his boat of $ 7,379.75, unreported legal fees from DMI of $ 4,600, additional income from his law partnership in connection with the payment for the captain of his yacht of $ 5,810.49, and income of $ 5,700 from unexplained deposits to his personal bank account. Respondent at trial conceded that the $ 5,700 of unexplained deposits was not properly includable in Mr. Mandina's 1969 income. In his notice of deficiency to Mr. and Mrs. Schaffer, respondent, in addition to the items included in the income of all petitioners, increased the Schaffer's reported income by the $ 17,000 loan proceeds first shown on DMI's books as being to Mr. Schaffer and later shown as being to Brian and Mikes, the $ 30,000 proceeds of a loan stated to be to Mr. Schaffer personally, *749 and unreported legal fees of $ 5,700.81. Respondent, in addition to the items he included in the income of all petitioners, increased the income reported by Mr. and Mrs. O'Nan by $ 2,000 of additional salary from DMI and $ 24,500 as founder's fee received in connection with the restaurant. Respondent in his notice of deficiency to Mr. Mitchell determined that in addition to the various items of income received by Mr. Mitchell, which were the same as the items determined to have been received by the other petitioners, he received salary from DMI of $ 12,000. ULTIMATE FINDINGS OF FACT 1. Respondent has established by clear and convincing evidence with respect to each of petitioners here involved, other than Mrs. Schaffer and Mrs. O'Nan, that there is an underpayment in tax for the year here in issue, a part of which is due to fraud. 2. Respondent has shown by clear and convincing evidence that the Federal income tax returns for 1969 filed by Mr. Mandina, the 1969 Federal income tax return filed by Mr. and Mrs. Schaffer, and the 1969 Federal income tax return filed by Mr. and Mrs. O'Nan were each false and fraudulent with intent to evade tax. 3. Respondent has shown *750 no fraud with respect to Mrs. Schaffer or Mrs. O'Nan. [3]
4. Neither Mrs. Schaffer nor Mrs. O'Nan has offered any evidence to establish that she is an innocent spouse under section 6013(e). [4]
OPINION The assessment and collection of a deficiency with respect to each of petitioners Mandina, O'Nan and Schaffer for the year 1969 was barred by the statute of limitations at the time of the issuance of the notice of deficiency absent a showing by respondent that each of their returns for 1969 was false and fraudulent with intent to evade tax. Respondent must establish this fraud by clear and convincing evidence. . However, the proof of fraud may rest on circumstantial evidence and the reasonable inferences to be *751 drawn therefrom. . The question is essentially factual and must be based on a consideration of the record as a whole. . Respondent in this case alleged that there existed a conspiracy among petitioners Mandina, O'Nan, Schaffer and Mitchell to obtain funds by defrauding Harriet Pierce Mitchell or the corporation DMI, to which she contributed $ 2,600,000 of assets. At the trial respondent stated that even absent conspiracy there was clear and convincing evidence of fraud with respect to each petitioner. Petitioners argue that respondent has not established the existence of a conspiracy among them and, since that was the basis of his allegation of fraud, he should not prevail in the case. Petitioners take the position that the only evidence presented by respondent indicating a conspiracy was the testimony of Terry Timme. They state that since Ms. Timme had been a prostitute and was testifying under a grant of immunity, her testimony should not be believed. They further argued that her testimony should not be believed because she has a case pending *752 with respondent's office and therefore would not be an impartial witness because she might believe she would get some special consideration in connection with her own case by testifying favorably to respondent. The record, however, shows that no promises were made to Ms. Timme in connection with her own case in return for her testimony in the instant case. None of petitioners chose to cross-examine Ms. Timme at the conclusion of her direct testimony. They do, however, argue that certain inconsistencies exist in her testimony and other facts in the record. Primarily, the inconsistency they claim is the fact that the check for $ 260,000 was cashed in Miami in August 1969 and she testified that it was late October 1969 when she saw the four petitioners with currency of between $ 200,000 and $ 229,000 and overheard their discussion with respect to that currency. They further argue that Ms. Timme's testimony that she believed that the bands on the packages of currency she saw were from a New York bank shows that her testimony is unbelievable. In our view, Ms. Timme's testimony is not inconsistent with the other facts in this case. The record indicates that the $ 35,000 that was *753 actually paid for the shares of Sooner oil stock came from the proceeds of the $ 260,000 check. The record also shows that after the signing of certain papers in early August by Stefano Brandino indicating that Mr. Brandino was purchasing 344,500 shares of stock of Sooner for $ 35,000 and selling those shares to DMI for $ 260,000, Mr. Schaffer took cash in the amount of $ 35,000 to New York to pay for the transfer of the Sooner oil shares to DMI. The record nowhere shows that these shares were actually transferred to DMI, but, even assuming they were, it is clear that only $ 35,000 was paid for these shares and possibly an additional $ 3,000 to Mr. Brandino for his services in signing papers indicating that he purchased the stock for $ 35,000 and sold it to DMI for $ 260,000. There is no showing whatsoever in the record as to what ultimately happened to the $ 222,000 or $ 225,000 balance of this currency other than Ms. Timme's testimony that Mr. Schaffer brought currency in this approximate amount to the apartment in which Ms. Time lived at the Jockey Club in Miami in October 1969 and that Mr. Mandina put this currency in his briefcase in late October and took it away with him. *754 There is no showing and no proof of any redeposit of any of the currency from the $ 260,000 or any explanation given of the disposition of this amount other than Ms. Timme's testimony. Therefore, the fact that Ms. Timme believed the bands on the currency were those of a New York bank does not cause us to consider her testimony as to the currency unbelievable. In any event, we would believe the balance of Ms. Timme's testimony even if we considered her identification of the bands on the currency to be mistaken. We found Ms. Timme to be a credible witness and we believe her testimony. The only explanation that petitioners attempted to offer with respect to showing the cost of the Sooner stock on DMI's books as $ 260,000 when in fact it had cost only $ 35,000 was that Mr. Mitchell or Mrs. Mitchell planned to invest this amount "offshore." At this point it should be noted that Mr. Mitchell was not personally at the trial. The record shows that respondent had made efforts over a period of 30 days to subpoena him without being able to locate him. Mr. Mitchell's counsel at the hearing was in no way helpful in assisting in locating Mr. Mitchell. Respondent had a question and answer *755 statement under oath given to a special agent which was received in evidence only with respect to Mr. Mitchell. However, there is no showing in the record that any of petitioners attempted to locate Mr. Mitchell to have him testify with respect to the $ 260,000 check, or any other matter. Petitioners also argue that Mrs. Mitchell might have been called as a witness with respect to this and other items. [5] However, we place no weight on the fact that neither respondent nor petitioners called Mrs. Mitchell to testify since the record is reasonably clear that she knew little, if anything, about the activities with respect to DMI. On the basis of Ms. Timme's testimony and reasonable inferences to be drawn from the other evidence in the record, we conclude that approximately $ 225,000 of the DMI check for $ 260,000 dated August 11, 1969, was taken in currency by Mr. Mandina to his office, and, because of the fact that all four petitioners participated in the discussion with respect to this currency, we further conclude that in some way the currency was split among them in accordance with a plan they worked out. Petitioner Mandina argues that even if we believe Ms. Timme's testimony *756 with respect to his taking currency in his briefcase from the apartment she was occupying, respondent has not established that he diverted any of this currency to his own use. He argues that it would be logical for him, as the DMI attorney, to take this currency to his office for safekeeping until it could be invested by DMI in "offshore" investments. We are not impressed with this argument. Mr. Mandina testified at this trial that he never had in his possession any amounts of currency in excess of $ 10,000 which came from or belonged to DMI. This testimony completely contradicts any claim Mr. Mandina might otherwise be justified in making that he was holding DMI cash as attorney for DMI for its benefit. Also, the large cash expenditures made by Mr. Mandina in 1969 and the two immediately following years without showing of any available source of such cash funds, are support for the conclusion that he had cash amounts which came from the funds which the record clearly shows were siphoned off from DMI but shown as expenditures on behalf of DMI on the records of the corporation. *757 Whether in the technical sense respondent has shown a conspiracy among petitioners is of little importance in this case since the record clearly establishes that petitioners did have an agreement among themselves to extract money from DMI for their own benefit, and that they did so. Evidence in the record, other than Ms. Timme's testimony, also supports the conclusion we have reached that all of petitioners participated in extracting funds from DMI for their own benefit.The record shows that Mr. O'Nan obtained at least $ 24,500 in income in connection with the sale of a 51 percent interest in the restaurant to Mr. Mitchell which he did not report on his tax return. The record, in our view, is clear that Ms. Casey did not owe any money to Mr. O'Nan and that Mr. O'Nan did not in fact have any second mortgage on the restaurant. The record also shows that Mr. Mandina prepared the papers to purportedly cover up the disbursement of $ 18,500 of the funds connected with the restaurant purchase to Mr. O'Nan. The record further shows that Mr. Mandina obtained $ 30,000 from an amount shown on the books of DMI as a loan to Mr. Mitchell in 1969 which he did not report as income. Mr. Mandina *758 claimed that this amount was a loan to him from Mr. Mitchell. However, there is no showing that Mr. Mandina ever acknowledged or paid such $ 30,000 was an indebtedness to either Mr. Mitchell or to DMI. If Mr. Mandina received $ 30,000 as a loan from Mr. Mitchell, which Mr. Mitchell had obtained as a purported loan from DMI, it would seem that Mr. Mandina would have repaid the $ 30,000 to DMI after Mr. Mitchell left Miami. Furthermore, the record shows that shortly after the time that cash was extracted from DMI by checks written that were cashed and the proceeds not spent for DMI purposes, Mr. Mandina engaged in a number of cash transactions and used substantial cash for various purposes. The record as a whole does not account for any reasonable source of such cash funds to Mr. Mandina other than funds received from DMI. The record also shows that Mr. Mandina had cash in an develope in the safe deposit box he held jointly with his mother and does not show the amount of such cash. However, the cash was placed there during the time in 1969 that unaccounted-for money was being withdrawn from DMI. The record does not show any source from which Mr. Mandina might have obtained these *759 amounts of cash other than DMI. Mr. Mandina's mother did not know how much cash was in the envelope, but thought her son had put it there because he was in the process of obtaining a divorce from his wife. Mr. Mandina himself denied that he had any cash in the safe deposit box which he held jointly with his mother, and on brief attempted to explain her statement that he had an envelope containing cash in the safe deposit box by contending that he was referring in his testimony to cash obtained from DMI and not the cash contained in the envelope that his mother stated he had put into their joint safe deposit box. The record shows that Mr. Schaffer took at least $ 47,000 from DMI in 1969 which he referred to as "loans." However, no notes were involved in these transactions. The $ 17,000 loan which Mr. Schaffer said was intended to be made to a corporation he formed, Brian and Mikes, was never repaid and the $ 30,000 alleged loan was not repaid, although in 1971 instead of this loan being directly written off the DMI books it was transferred over to an account designated as "attorney fees" owed to Mr. Schaffer. The record, however, does not show that services Mr. Schaffer rendered *760 to DMI for these alleged attorney fees and the inference is that this change in the books was made at Mr. Schaffer's directions after Mr. Mitchell had left Miami. We also believe the testimony of Ms. Casey that when she sold her 49 percent interest in the restaurant to DMI she only received $ 100,000. In coming to this conclusion, we have not overlooked the fact that long after the transaction occurred, when Ms. Casey was living in Texas in 1980, Mr. Mandina went to her and had her sign a statement saying she had received $ 200,000 as consideration for the sale of her 49 percent of the DuPont stock. When shown the paper, Ms. Casey recognized her signature but stated she did not remember signing it, that she did not receive $ 200,000 but only $ 100,000. She stated that she had no recollection at all of signing the paper, even though it bore her signature. However, she did remember recently signing some paper in Dallas for Mr. Mandina. She testified, under prompting by Mr. Mandina, that he had come to see her in Dallas recently and brought a paper for her to sign. She stated that she did not have her glasses and asked him to read the paper to her and that after he read it to *761 her, she asked a friend of hers, who was there in a wheelchair, to read it over. He read it and asked Mr. Mandina some questions. Then, at Mr. Mandina's request, she signed the paper without herself reading it. Although the paper signed by Ms. Casey in 1980 stated that she had received $ 200,000 for the sale of her 49 percent interest in DuPont, her testimony at the trial was consistent that she only received $ 100,000. Based on this record as a whole, we conclude that Ms. Casey was not completely aware of the contents of the document she signed in 1980 and that in fact she only received $ 100,000 in payment for her 49 percent interest in the stock of DuPont, which owned the restaurant. On the basis of this record as a whole, we conclude that each petitioner received sums of money in 1969, the source of which was DMI, which they did not report on their Federal income tax returns. We further conclude after considering the record as a whole, including the testimony of each of petitioners, which in the case of Mr. Mitchell was a sworn statement given to a special agent, that each of petitioners knew he had received income from DMI, that he attempted to conceal this fact, and that *762 he fraudulently failed to report this income on his Federal income tax return for 1969. Because of our conclusion that the tax returns filed by each of petitioners Mandina, O'Nan and Schaffer were false and fraudulent, the assessment and collection of taxes against each of them was not barred by the statute of limitations on the date of the mailing of the notice of deficiency. We also conclude that a part of the deficiency in tax of each petitioner is due to fraud, and respondent has established this fact, as well as the fact that the returns were false and fraudulent, by clear and convincing evidence. We therefore sustain respondent's determination of the addition to tax for fraud. Since we have concluded that respondent has shown with respect to each petitioner an underpayment of tax in the year 1969, a part of which was due to fraud, it is incumbent on petitioners to show that the amounts of the deficiencies as determined by respondent are in error. . Because of the position taken by each petitioner, that he had received no unreported income, it is very difficult to determine exactly how much of the money extracted *763 from DMI by the four petitioners was taken by each. Respondent resolved this problem by determining that each petitioner received the full amount that the four of them took from DMI. The result of this is in effect to tax the same funds to four different persons. The only petitioner who attempted to fix the amount which he obtained from DMI was Mr. Mitchell. The amount he testified to receiving from the various sums taken from DMI and not spent for DMI purposes was less than his one-fourth share of the total amounts fraudulently diverted from DMI. Although Mr. Mitchell admitted receiving some of the funds diverted from DMI, he stated that he took what was brought to him by either Mr. O'Nan or Mr. Mandina. Considering the facts that Mr. Mitchell did not appear at the trial and that his statements to the agent under oath are admissions by him and not testimony on his behalf, they are insufficient to establish the actual amounts he received. Also, the record is far from clear as to how the $ 300,000 of cash received from the $ 400,000 check drawn on DMI to Harriet Pierce on June 20, 1969, was divided. The reasonable inference is that Mr. Mitchell got only the $ 100,000 he received *764 in a check and deposited to his account. Because of the lack of evidence and our belief that it would be totally unfair to tax the same amount to each of these petitioners merely because of their failure to prove the division of the amount, we conclude that one-third of the $ 300,000 obtained from the June 20, 1969, check is taxable to each of petitioners Mandina, O'Nan and Schaffer, and none of this amount is taxable to petitioner Mitchell. Because of this same lack of evidence, we conclude that one-fourth of the $ 100,000 retained from the Black Caesar's Forge transaction, one-fourth of the $ 225,000 coming from the $ 260,000 check, one-fourth of the $ 125,000 of checks issued in connection with the transaction originally shown on DMI books as amounts loaned to Mr. Schaffer or BLW Films, one-fourth of the $ 38,000 retained from the Trans-Florida transaction, and one-fourth of the $ 60,000 check drawn in December 1969 is taxable to each of the four petitioners. We further conclude that the other amounts determined by respondent to be taxable to each of petitioners has not been shown to be in error except with respect to the $ 5,700 of unexplained bank deposits included by respondent *765 in Mr. Mandina's income which respondent has conceded to be in error. Mr. Mitchell has made no showing that respondent was in error in determining the addition to tax for failure to file an estimated tax return and pay an estimated tax. We therefore sustain this determination of respondent. We have not overlooked Mr. Mitchell's contention that it had been Harriet Pierce's intention to give him $ 400,000 as a wedding gift and since he received only $ 100,000 of the amount, he had a $ 300,000 loss in 1969 which should be subtracted from his otherwise taxable income.Mr. Mitchell also contended that he sustained losses in connection with the unpaid indebtedness owed to him. The short answer to this contention is that it is without merit and is totally unsupported by the record. Insofar as this record shows, Mr. Mitchell, himself, participated in the transaction whereby $ 400,000 was withdrawn from DMI and split. There is no showing in this record that he did not split the $ 300,000 among Mr. Mandina, Mr. Schaffer and Mr. O'Nan. Mr. Mitchell chose not to appear at the trial and testify and, in fact, for all practical purposes was hiding out to keep from testifying. We therefore *766 conclude that there is no basis to his argument with respect to any losses. It might also be pointed out that he repaid no amount to DMI shown as due from him and, therefore, if any of this money was lent to other persons it was DMI who suffered the loss and not Mr. Mitchell. We sustain the determination of respondent of tax and addition to tax for fraud as determined in his notices of deficiency except to the extent as set forth above of splitting certain amounts extracted by the four petitioners from DMI equally among them, and splitting the $ 300,000 taken from the check of June 20, 1969, equally among petitioners Mandina, O'Nan and Schaffer, and of course except with respect to the items determined to be income of Mr. Mandina which respondent has conceded. Also, we conclude that there is no addition to tax for fraud due by Mrs. Schaffer and Mrs. O'Nan. Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Roy I. O'Nan and Madeline O'Nan, docket No. 1944-78; Michael A. Schaffer and Jennifer Schaffer, docket No. 3565-78; and Dana Mitchell, Jr., docket No. 3890-78.↩
2. Unless otherwise noted, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the year here in issue.↩
*. Complete date illegible↩
*. Complete date illegible↩
3. On brief, respondent conceded this fact.↩
4. It is not clear whether this issue was actually involved in the case.In one petition the issue was not raised, and in the other petition it was raised but no evidence with respect thereto was introduced. For this reason, no further reference other than this finding will be made to the innocent spouse issue if such an issue is present.↩
5. Petitioners argue that Mrs. Mitchell was in the courthouse during the trial of this case but was not called as a witness. However, the record does not show this to be a fact. There is no showing with respect to where Mrs. Mitchell was at the time of the trial o this case or why neither party called her to testify.↩