**Philip J. MANDINA,**
**Petitioner-Appellant,**

v.

**COMMISSIONER, INTERNAL**
**REVENUE SERVICE,**
**Respondent-Appellee.**

No. 83–5375.

United States Court of Appeals,
Eleventh Circuit.

Aug. 8, 1984.

Sidney A. Soltz, Miami, Fla., for petitioner-appellant.

Michael L. Paup, Chief, Appellate Section, Glenn L. Archer, Jr., Tax Div., William S. Estabrook, III, Libero Marinelli, Jr., Dept. of Justice, Washington, D.C., for respondent-appellee.

---

\* Honorable Earl O'Connor, Chief United States District Judge for the District of Kansas, sitting by designation.

Before FAY and ANDERSON, Circuit Judges, and MARKEY *, Chief Judge of the Federal Circuit.

PER CURIAM:

In this civil tax case, the appellant, Philip J. Mandina, challenges the Tax Court's determination of a $178,902.00 deficiency in Mandina's 1969 federal income tax return and its assessment of an $89,451.00 fraud penalty relating to that return.[1] Finding ample support in the record for the Tax Court's ruling, we affirm.

### FACTS

The Tax Court determined the deficiency in Mandina's return by tracing to him unreported income from a very complex scheme, through which Mandina and three co-conspirators misappropriated funds from a corporation, DMI.[2] The nature of the scheme is recorded fully in the Tax Court's memorandum opinion, and we highlight only some of the relevant aspects.

Mandina is an attorney and in 1969 was engaged in practice in Miami, Florida. Mandina was introduced to Dana Mitchell, Jr. (one of the conspirators) in late 1968 by a mutual friend, Michael Schaffer (another conspirator). In April of 1969, Mitchell, with the assistance of Mandina, formed DMI. DMI was capitalized with $2.6 million in stocks and bonds, contributed by Harriett Pierce. Mitchell and Pierce became husband and wife in June of 1969.

In essence, the conspirators used DMI to effect a scheme for converting Ms. Pierce's $2.6 million contribution to their own personal use. Throughout 1969, DMI "invested" in properties and stocks. The amounts paid for these investments were grossly overstated in the corporation's books. The difference between the actual price of the assets purchased, and the purchase price reflected in DMI's books, was converted into cash and ended up in the hands of the four conspirators. These "investments" were ultimately written off as worthless within a year of their acquisition by DMI. At other times, DMI would make "loans" to one of the conspirators or a company owned by one of the four; these "loans" were seldom evidenced by formal notes of indebtedness and, to the extent they were recorded in DMI's books, DMI wrote them off as bad debt losses in subsequent years.

Throughout 1969, the DMI offices were located in Mandina's law office in Miami. Mandina's secretary and Mr. Bud Carr, a long-time Mandina employee, were directors of the corporation along with Mitchell. Neither actively participated in the management of DMI, although Carr ran a number of errands for DMI and often issued and cashed the checks used to misappropriate DMI funds. Mandina served as corporate counsel for DMI, attended most of the Director's meetings, and participated in the corporation's decisionmaking. Schaffer served DMI as investment counsel. The fourth co-conspirator, Roy O'Nan, was a friend of Mandina's and became involved with DMI during the initial transaction relied upon by the Tax Court in finding

---

* Honorable Howard T. Markey, Chief Judge, U.S. Court of Appeals for the Federal Circuit, sitting by designation.

1. The fraud penalty was assessed under § 6653(b) of the Internal Revenue Code (26 U.S.C.), which provides: "If any part of an underpayment ... of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment."

2. Mandina's case was consolidated with that of Michael Schaffer, Roy O'Nan, and Dana Mitch-

ell. The Tax Court found that all four had participated in a scheme to misappropriate funds from DMI. The Tax Court did not make a specific finding as to the existence of a conspiracy in the technical sense between the four taxpayers, because such a finding was not necessary to the disposition of the case. The Tax Court did find that there was an agreement among them to extract monies from DMI for their own benefit. For purposes of convenience only in this opinion, we refer to the four taxpayers as "co-conspirators."

that the four has misappropriated funds from the corporation.

Mandina reported an adjusted gross income of $17,055 on his 1969 tax return ($22,000 in partnership income from his law firm, capital losses of $1,000, and a $4,000 individual loss). In January of 1978 the Commissioner sent Mandina and the three other conspirators notices asserting a federal tax deficiency of approximately $600,000 for each taxpayer. The deficiency for each was based on "other income," which included:

1. Black Ceasar's Forge. Partial proceeds of purported purchase price of Black Ceasar's Forge by D. Mitchell Investments, Inc. diverted by you $100,000

2. Sooner State. Net proceeds from the purchase of stock in Sooner State Oil Co., Inc. by D. Mitchell Investments, Inc., diverted by you $225,000

3. BLW Films. Net proceeds of checks issued by D. Mitchell Investments, Inc., diverted by you as follows:

| | | |
|---|---|---|
| 8/19/69 | #UNKNOWN | $20,000 |
| 9/3/69 | #248 | 35,000 |
| 11/25/69 | #374 | 70,000 |

Total $125,000

4. Trans-Florida. Partial proceeds of D. Mitchell Investments, Inc., check No. 292 in the amount of $53,000 diverted by you $38,000

5. Mitchell Loan. Proceeds of D. Mitchell Investments, Inc., check No. 396 dated December 3, 1969, diverted by you $60,000

6. Wedding Gift. Proceeds of check from Harriett H. Pierce, dated June 20, 1969, diverted by you $400,000

The deficiency also attributed to Mandina an additional $30,000 in income, and disallowed an expense deduction of $5,000. Neither of these matters are in dispute on this appeal.

Mandina contested the deficiency and filed suit in the Tax Court for redetermination. The court found that the government had adequately established that in each of the above-listed instances, the four conspirators had misappropriated funds from DMI. In each instance the money, or "other income," ended up with at least one of the four members of the agreement, and none of the income was reported on any of the four's 1969 tax returns. However, in the Tax Court's opinion, it was improper to tax each member for the full amount of "other income." Rather than taxing the same income four times, the Tax Court divided equally among the four the misappropriated funds that could not be traced to a single individual.

## ISSUE ON APPEAL

Mandina challenges the Tax Court's determination of the deficiency as clearly erroneous. He contends that the government never adequately established his receipt of proceeds from the funds allegedly diverted from DMI.

## DISCUSSION

Implicit in Mandina's argument on appeal is a challenge to the government's method of proving the deficiency. In the Tax Court, the government did not attempt to show directly Mandina's receipt of the diverted funds in each instance. Rather, the government relied on its establishment of Mandina's fraudulent failure to report income in 1969, and the nature of the scheme to misappropriate funds from DMI, to support an inference that Mandina received a share of the misappropriated funds. Once the Tax Court found the existence of an agreement to divert funds, and that funds had been diverted to the control of the conspirators, the government argued that Mandina had the burden of disproving the

amount of the deficiency. The Tax Court's holding reflects its acceptance of the method of proof argued by the government.

We look first to the government's proof relating to Mandina's receipt of misappropriated funds and his fraudulent failure to report that "income" on his 1969 tax return. After concluding that the Tax Court applied the appropriate legal standard and rendered findings supported by the evidence, we then briefly discuss the individual transactions in which the court found a diversion of funds to the conspirators, and conclude that these findings were not clearly erroneous.

A. *Mandina's Failure to Report "Other Income" and His Participation in the Scheme to Divert Income From DMI*

The government introduced evidence of specific instances in which the monies allegedly misappropriated from DMI ended up in Mandina's control. In particular, a witness testified that she saw Mandina depart from her apartment with the excess cash from the Sooner State transaction (*infra* B.2.). This testimony directly contradicted Mandina's testimony that he never handled more than $10,000 in cash for DMI.

In addition, the government introduced evidence that Mandina made large cash purchases in 1969 and later years, and was seen by his yacht captain with large amounts of cash. Mandina's possession of this cash was not reasonably explained by the amounts reported on his income tax returns. In 1969 and later years Mandina also maintained or had access to a number of joint bank accounts, stock broker's accounts, and safety deposit boxes. These accounts made it difficult to trace Mandina's income and expenditures, and supported the Tax Court's inference that Mandina was attempting to conceal income fraudulently. *See e.g., Estate of Upshaw v. Commissioner,* 416 F.2d 737, 741 (7th Cir.1969).[3]

Finally, the government's evidence established that Mandina, with O'Nan, Schaffer, and Mitchell, agreed to participate in the DMI scheme that resulted in the misappropriated funds. A witness testified that Mandina had stated he was in charge of the operation to bilk funds from Harriett Pierce and that he controlled Dana Mitchell's activities. Mandina's preparation of the legal papers relating to the transactions in which the misappropriation occurred further supports the Tax Court's finding regarding his participation in the scheme.

■■■ The court's findings relating to Mandina's fraudulent failure to report income and participation in the agreement to divert DMI funds, which are amply supported in the record, placed the burden of proving the invalidity of the deficiency assessment on Mandina. *Cannon v. Commissioner,* 533 F.2d 959, 962 (5th Cir.1976), *cert. denied,* 430 U.S. 907, 97 S.Ct. 1177, 51 L.Ed.2d 583 (1977);[4] *Bryan v. Commissioner,* 209 F.2d 822 (5th Cir.1954). Correspondingly, the existence of an agreement between the four taxpayers enabled the Tax Court to apply the principles discussed in *Cannon v. Commissioner,* and allocate

---

**3.** Because the notice of deficiency was not filed until 1978—almost eight years after Mandina timely filed his 1969 tax return and well outside the normal three year limitation period, see 26 U.S.C. §§ 6213(a) & 6501(a) & (b)(1)—the government bore the burden of proving by clear and convincing evidence that Mandina's 1969 return was false and fraudulent. *See* 26 U.S.C. § 6501(c)(1); *Bryan v. Commissioner,* 209 F.2d 822, 825 (5th Cir.1954). *See also Fairchild v. Commissioner,* 240 F.2d 944, 947 (5th Cir.1957) (clear and convincing standard). We find ample support in the record for the Tax Court's determination that Mandina received misappropriated funds (income) from DMI's 1969 trans-

actions, which he fraudulently failed to report on his 1969 tax return. The court's finding of fraud thus enabled the government to pursue the deficiency assessment against Mandina even though it was filed outside the normal three-year limitations period.

**4.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209.

to the four taxpayers a pro rata share of the misappropriated funds as unreported income.[5] Contrary to Mandina's position on appeal, under the principles of *Cannon* the failure of the government to prove that he personally received the diverted funds in each instance does not invalidate the deficiency assessment.

We conclude that the district court was not clearly erroneous in finding that money had been misappropriated in each instance from DMI, and that a reasonable inference could be drawn that the money ended up in the control of one of the four co-conspirators. In such circumstances the Tax Court did not err in attributing one-fourth of the proceeds to Mandina as unreported income in 1969. Mandina failed to rebut the asserted deficiency with anything other than his testimony that he never saw the money, which the Tax Court was free to disregard on credibility grounds.

We discuss each of the six transactions in which the district court found that money was misappropriated from DMI and ended up with one of the co-conspirators.

### B. *The Six Transactions*

### 1. *Black Ceasar's Forge*

DMI acquired the restaurant, Black Ceasar's Forge, in two installments from Mrs. Ruth Casey. The first installment took place in February of 1969 and resulted in Mitchell's purchase of a 51% share in the restaurant. The second installment was DMI's purchase of Mrs. Casey's remaining 49% share. DMI issued four checks to Casey in late April and early May of 1969, one for $100,000, another for $50,000, and two for $25,000. Mrs. Casey testified that she assisted Mr. O'Nan, who was her trusted employee, in converting those checks into cash, but that she received only $100,000 of the proceeds. By her testimony,

which the Tax Court found credible notwithstanding the fact that she had signed a receipt for the full $200,000, the Tax Court found that $100,000 had been misappropriated from DMI and traced that money directly to Mr. O'Nan and by inference to the other three taxpayers. The Tax Court's finding that $100,000 had been diverted from DMI and therefore that Mandina received one-fourth of the money, which was based on an express credibility determination, was not clearly erroneous.

### 2. *Sooner State Transaction*

This transaction was arranged by Mr. Schaffer and involved the purchase of 344,500 shares of Sooner State stock. The purchase was conducted through an intermediary, Mr. Brandino, who purchased the stock and transferred it to DMI. Although the stock was purchased for $35,000 cash, DMI drafted a check for $260,000, all of which was converted into cash. Testimony placed the excess $225,000 in Mr. Mandina's control shortly after the transaction. Mandina and the other taxpayers claim that the excess cash was used by Mr. Mitchell for "off shore" investments, none of which were shown by the taxpayer's evidence or reflected in DMI's books. The Tax Court was not clearly erroneous in finding a diversion of funds and attributing one-fourth of the $225,000 to Mandina as unreported income.

### 3. *BLW Films*

In 1969, Schaffer joined two unrelated parties in forming BLW Films. The asserted business of BLW was the purchase of foreign films for distribution in the United States. DMI supplied the sole operating capital for the venture, $125,000 (two checks to Schaffer in the amount of $20,000 and $35,000 and one to BLW for $70,-

---

**5.** *Cannon* involved two taxpayers, Ash and Cannon, who received $64,000 from a third individual. The money was to be used for betting on college football games. Neither taxpayer reported this "income" on his 1967 tax return. The Tax Court determined that the income was received in connection with the gambling operation, but the court was unable to determine how the money was divided between the two taxpayers. Accordingly, the court divided the income pro rata between Cannon and Ash, and found a deficiency based on this allocation. The court of appeals affirmed under the principle that once a deficiency is shown, the taxpayer must show that the Commissioner's determination is invalid. 533 F.2d at 962.

000). Although Schaffer testified that BLW was an active, albeit unsuccessful venture, no documentary evidence established the use of the $125,000 by BLW. DMI's books were amended in 1970 to show the $55,000 as going to purchase additional shares of Sooner State. The remaining $70,000 was written off as bad debt. Because the money was last placed in the hands of Mr. Schaffer, and not satisfactorily accounted for, the Tax Court was justified in attributing one-quarter of the $125,000 to Mr. Mandina as unreported income.

### 4. *Trans-Florida Transaction*

In October of 1969, DMI purchased all of the stock of Trans-Florida Assurance Agency, Inc., from Mrs. Margaret Machen. DMI drafted a check for $53,000, of which $15,000 was used to satisfy Trans-Florida's existing creditors. Mr. Carr, Mandina's employee and a Director of DMI, then executed a receipt for the remaining $38,000 in cash. Mrs. Machen testified that she never saw the $38,000 after Carr took possession. Carey Matthews, Machen's nephew and a former law partner of Mr. Mandina, also testified that Carr took possession of the cash. Again, less than six months after this purported investment, the full $53,000 was written off as worthless. The Tax Court was not clearly erroneous in attributing one-quarter of the $38,000, which was last seen in the possession of Mandina's agent, to Mandina as unreported income.

### 5. *Mitchell Loan*

In December 1969 Mitchell wrote a check on DMI's account, payable to himself and bearing the notation of a loan. Mitchell first endorsed the check, which was then endorsed by Carr and converted into cash. There is no further evidence accounting for disposition of the proceeds. The evidence supports two possible inferences. Either Mitchell received the proceeds or Carr did, as reflected by his endorsement. In either event, the Tax Court, by virtue of Mitchell and Mandina's participation in the agreement to misappropriate funds, or because

of Mandina's relationship with Carr, was justified in its finding that Mandina received a portion of the proceeds.

### 6. *Wedding Gift*

The final item of income attributed to Mandina was traced from a June 20, 1969, check in the amount of $400,000 to Harriett Pierce (Mitchell), issued on DMI's account by Mr. Carr. Mitchell and Pierce were married the next day. Mitchell and Pierce went together to the National Industrial Bank on June 20 and deposited the check in Ms. Pierce's account. She then wrote two checks, one to Mitchell for $100,000, and the second one for cash in the amount of $300,000. The $300,000 check was converted into a cashier's check at a second bank. At a third bank, the cashier's check was then converted into cash.

Mitchell and Pierce left the last bank together. Mandina testified that he assumed that Mitchell kept the full $400,000. O'Nan testified that he accompanied Mitchell and Pierce during the transactions and did not know where the money ended up. Carr, Mandina's employee, also accompanied Mitchell and Pierce, and it was he who drafted the original check.

The evidence was sufficient to support the Tax Court's finding that Mandina received a share of the $400,000. Mandina's own testimony placed the money last in the hands of Mitchell, one of the four taxpayers party to the scheme. Attributing the money to Mandina was consistent with his statements that he was in charge of the operation to bilk money from Ms. Pierce. None of the taxpayers called Ms. Pierce to refute the permissible inference that the $400,000 was part of the ongoing scheme and distributed between the taxpayers.

### CONCLUSION

In summary, we find the evidence sufficient to support the Tax Court's findings with respect to Mandina's false and fraudulent 1969 return. Mandina did not adequately rebut the amount of the deficiency assessed in connection with any of the six

transactions discussed. Accordingly, the Tax Court's judgment is

AFFIRMED.