**Andrew TOUSSAINT and Isela C. Toussaint, Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**No. 84–4246**
**Summary Calendar.**

United States Court of Appeals,
Fifth Circuit.

Oct. 9, 1984.

Dougal C. Pope, Houston, Tex., for petitioners-appellants.

Glenn L. Archer, Jr., Asst. Atty. Gen., Tax Div., Michael L. Paup, Chief, Appellate Sec., Charles E. Brookhart, George L. Hastings, Jr., Dept. of Justice, Tax Div., Fred T. Goldberg, Jr., Chief Counsel, I.R.S., Washington, D.C., for respondent-appellee.

Before WILLIAMS, JOLLY, and HILL, Circuit Judges.

ROBERT M. HILL, Circuit Judge:

The United States Tax Court, Whitaker, J., assessed against Andrew Toussaint in-

come tax deficiencies and penalties for fraudulent underpayment of income taxes for the taxable years 1971–1975.[1] Toussaint appeals, arguing that the tax court's decision was not supported by sufficient evidence. Because we find no clear error in the tax court's decision, we affirm.

Toussaint, a resident of Houston, Texas, is a former Internal Revenue Service (I.R.S.) agent who now operates a used car lot. He claims that on July 9, 1974, a painting which he had possessed for several years was stolen out of his home. Also taken, he claims, were a component stereo set, several business suits and several car batteries. Toussaint's claim is unremarkable except for one fact: he alleges that the painting was created and signed by Pablo Picasso and was worth approximately $190,000.

Based upon the $190,000 net operating loss generated by the alleged theft, Toussaint[2] filed, on April 15, 1975, an Application for Tentative Refund for the years 1971, 1972 and 1973. The refund was justified by "carrying back" the net operating loss from 1974, the year of the alleged theft loss, to the three prior years. The I.R.S. refunded to Toussaint the following amounts for the three years, respectively: $1,958.64; $2,032.30; and $3,113.00. For the years 1974 and 1975 Toussaint filed returns claiming a net operating loss deduction based upon the same alleged theft and paid no taxes in those years.

The office of the Commissioner of Internal Revenue (Commissioner) issued to Toussaint a statutory notice of deficiency rejecting all deductions resulting from the alleged theft loss. As to the 1975 taxable year, the three-year statute of limitations, 26 U.S.C. § 6501(a), is not in issue.[3] However, the statute of limitations has foreclosed assessment of deficiencies for the years 1971–1974 unless the 1974 taxable year is re-opened under § 6501(c)(1) by reason of fraud.[4] Thus, if Toussaint's 1974 return was prepared fraudulently, then (a) the statute of limitations is inapplicable, under § 6501(c)(1), to the assessments for 1971–1974, and (b) penalties for fraudulent underpayment are assessable, under § 6653(b), for 1971–1975. Therefore, the entire case turns upon whether or not the net operating loss deduction was declared honestly.[5]

The Commissioner assessed deficiencies and penalties in the following amounts:

| Taxable Year | Deficiency | Penalty under § 6653(b) |
|---|---|---|
| 1971 | $1,958.64 | $ 979.32 |
| 1972 | 2,032.30 | 1,016.15 |
| 1973 | 3,113.00 | 1,556.50 |
| 1974 | 4,036.69 | 2,018.35 |
| 1975 | 5,184.08 | 2,592.04 |

Having found, after trial, (a) that Toussaint never owned a Picasso painting or any other painting of comparable value, (b) that Toussaint did not own a component stereo set immediately prior to the burglary,[6] and (c) that, even if he owned a Picasso painting, Toussaint knew that he did not have a

1. *Toussaint v. Commissioner,* 47 T.C.M. 913 (CCH 1984).

2. In all five of the years in issue, Toussaint filed returns jointly with his wife Isela C. Toussaint. Since January 1974, the Toussaints have been separated. They were divorced subsequent to the alleged theft. The fraud penalties, however, are asserted against Andrew Toussaint only.

3. Since Toussaint filed Consents to Extend Time to Assess Tax with respect to the 1975 taxable year, the last of which expired on December 31, 1981, the Commissioner's notice of deficiency, issued on May 26, 1981, was timely as to the 1975 return.

   Unless otherwise indicated all subsequent statutory references are to the Internal Revenue Code, 26 U.S.C., as amended.

4. Since Toussaint's refunds for 1971–1973 were produced by a carryback of the net operating loss incurred in 1974, those years are automatically re-opened pursuant to § 6501(h) if the 1974 taxable year is re-opened. Further, if 1974 is re-opened, then, again pursuant to § 6501(h), deficiencies for 1971–1973 are assessable under the same rules applicable to 1974 to the extent of the amounts attributable to the carryback from 1974. "Deficiency" under § 6501(h) is here understood to include the fraud penalty under § 6653(b).

5. Toussaint does not dispute the disallowance of the deductions taken in 1971–1975 or the timeliness of the assessment of the 1975 deficiency.

6. The Tax court made no finding as to whether or not, in fact, the burglary itself occurred. *Toussaint,* 47 T.C.M. at 916.

basis of $190,000 in the painting, the tax court concluded that Toussaint had filed fraudulent returns with intent to evade taxes under § 6653(b). *Toussaint*, 47 T.C.M. at 915–916. Accordingly, the tax court affirmed the Commissioner's assessments. Because we can see no clear error in the tax court's finding that Toussaint never owned a Picasso painting, we affirm without reviewing findings (b) and (c).

## A. *The Evidence*

The trial of the case produced several factual disputes. The bulk of the evidence addressed the critical dispute, viz., whether Toussaint owned a Picasso painting. Toussaint's account of the painting's advent and disappearance was riddled with discrepancies and suspicious failures of memory. His account was contradicted by several apparently disinterested witnesses. The tax court found that Toussaint's testimony was "totally noncredible." *Toussaint*, 47 T.C.M. at 917. As we shall see, it had ample basis for this finding.

The painting which is the subject of this appeal had a rather mysterious history. Toussaint testified that his grandfather, admittedly a poor man, had given the painting to him.[7] Since the grandfather died in 1949, when Toussaint was 4 years old, Toussaint testified that his grandfather "gave" the painting to him by leaving it at his mother's home in Lake Charles, Louisiana, where it was stored in the attic from 1949 to 1970. Toussaint's mother, however, denied all knowledge of the painting's existence. In 1970 Toussaint acquired possession of his grandfather's "gift" and took it to his new home in Houston. Although he knew of its value before 1970, he merely stored the painting in a closet. The painting was never registered or insured.

On July 9, 1974, at approximately 6:30 p.m., Toussaint reported to the Houston police that more than 17 hours earlier, at 1:00 a.m., his home had been burglarized. According to the police report, Toussaint claimed that three items were taken: one car battery, one brown business suit and the Picasso. At trial, however, Toussaint testified that not one but several suits were stolen (he did not know how many nor could he describe any of them—even the "brown" one) and that not one but several car batteries were stolen.[8] He could not explain why these additional items were never reported as stolen. To the police, Toussaint described the painting as depicting a boat on an island but he could give no further details. At trial Toussaint testified, however, that the painting actually depicted "a woman" from about the waist up. Possibly, he said, there was a small boat in one corner of the painting. Again, Toussaint could not explain the discrepancy in the two descriptions of the subject matter of the painting, nor could he describe the painting further.

At the time of the burglary in 1974 Toussaint was separated from his wife. For part of that year, including the month of July, Mrs. Patricia Samples (at the time Patricia Henderson) lived with Toussaint. Mrs. Samples had heard of the painting only one time and she had never seen it.[9]

Although some of the above discrepancies do not relate directly to the question of the existence of the Picasso, the tax court

---

7. Toussaint, unable to explain how his indigent grandfather came to possess a work of such value, at one point surmised that he might have stolen it.

8. Toussaint admitted that there were other valuable items in the house that night, such as jewelry, a color television set and additional business suits, all of which were left untouched.

9. Mrs. Samples was out of town during the entire week of July 9, 1974. Although she spoke with Toussaint every day of that week, both before and after the alleged burglary, he never mentioned the burglary to her. Nor had any of her property, stored in his home, been taken or disturbed.

Further, Mrs. Samples had never seen the component stereo set that Toussaint claims to have lost in the burglary; this, despite Toussaint's claims that the stereo was situated in the living room in plain view. Toussaint could not describe the stereo; he could not even remember how many speakers nor what kind of components it contained. Finally, he had no records of its purchase or maintenance, nor did he have an instruction booklet.

considered them crucial in evaluating the credibility of Toussaint and his witnesses. Of course, in an action for fraud, the honesty of the accused is not only important, it is controlling. If, at trial, Toussaint lied about having owned a Picasso, as the tax court found, then, not having altered the thrust of his claim, he could be deemed to have falsified the theft of the Picasso in the preparation and filing of his tax return.

In summary, the only evidence of the painting's existence, as the tax court found, was the testimony of Toussaint, his wife and a friend.[10] The tax court found their testimony to have been "self-serving" and "totally noncredible." *Toussaint*, 47 T.C.M. at 917. Instead, the court was impressed with the story related by Toussaint's mother and Mrs. Samples, who were in knowledgeable positions and who said they never saw the Picasso.[11]

### B. *The Standards*

The evidentiary standards to be applied in cases such as this are firmly established. The Commissioner has the burden of proving, by clear and convincing evidence, that some portion of the deficiency assessed was produced by fraud with intent to evade taxes. § 7454(a); § 6501(c)(1); *Toledano v. Commissioner,* 362 F.2d 243, 247 (5th Cir.1966). Whether the deficiency, either by understatement of income or by overstatement of deductions, was produced by fraud is a question of fact. *Otsuki v. Commissioner,* 53 T.C. 96, 105 (1969); *Loftin & Woodard, Inc. v. United States,* 577 F.2d 1206, 1238–39 (5th Cir.1978) (listing certain factors which indicate fraud). Fraud "is never imputed or presumed and the court should not sustain findings of fraud upon [sic] circumstances which create at most only suspicion." *Olinger v. Commissioner,* 234 F.2d 823 (5th Cir.1956) (quoting *Davis v. Commissioner,* 184 F.2d 86 (10th Cir.1950)). However, the government may discharge its burden by producing circumstantial evidence. *Mar-*

*sellus v. Commissioner,* 544 F.2d 883, 885 (5th Cir.1977); *Stoltzfus v. United States,* 398 F.2d 1002, 1005 (3rd Cir.1968). Although mere refusal to believe the taxpayer's testimony does not discharge the Commissioner's burden, *Guinn v. Commissioner,* 46 T.C.M. 709, 719 (CCH 1983), the lack of credibility of the taxpayer's testimony, the inconsistencies in his testimony and his evasiveness on the stand are heavily weighted factors in considering the fraud issue. *Henry v. Commissioner,* 362 F.2d 640, 643–44 (5th Cir.1966); *George v. Commissioner,* 338 F.2d 221, 223 (1st Cir.1964).

Although the Commissioner's burden is heavier here than in most civil cases, our review of his performance is limited. In order to reverse, we must find that the tax court's findings were "clearly erroneous as to *all* items which comprise the deficiency." *Webb v. Commissioner,* 394 F.2d 366, 378 (5th Cir.1968) (emphasis in original); Fed.R. Civ.P. 52(a). A finding is clearly erroneous, as the courts have stated often before, "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *McGee v. Commissioner,* 519 F.2d 1121, 1125 (5th Cir.1975). Finally, "due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Fed.R.Civ.P. 52(a).

### C. *Analysis*

In applying the standards to this case, we note the unique nature of the contention which, necessarily, lies at the heart of the Commissioner's position, viz., that Toussaint never owned a Picasso painting. We have here not the common and frequently discussed understated income case, where the Commissioner is obligated to show that the taxpayer owned something

---

**10.** Although Toussaint's friend, Mr. Cobb, claimed familiarity with Picasso's art (based upon a college course), he could not recall a single aspect of Toussaint's Picasso, except that it had a bluish color.

**11.** The tax court expressly found that Mrs. Samples' testimony was "entitled to complete credence." *Toussaint,* 47 T.C.M. at 916, n. 9.

which he failed to report, but, rather, its compliment, the overstated deduction case, where the Commissioner is obligated to show that the taxpayer did not own something which he did report. We cannot overemphasize the difficulty of proving that an object did not exist, at least in the form and condition in which it was claimed to have existed. By the same token, that task becomes even more onerous when those who claim that the object existed cannot describe it with any reasonable particularity.

■ Thus, the burden cast upon the Commissioner was to bring forth "affirmative" proof[12] of the negative proposition that Toussaint never owned a Picasso painting. By its nature, this proposition permitted the Commissioner to paint only a negative picture, e.g., that Toussaint's story is improbable (if not unbelievable), that it fairly teems with contradictions and suspicious lapses of memory, and that no disinterested party ever saw the painting. Citing the infirmities in Toussaint's account of the facts may appear to place the burden of proof on him and thereby improperly shift the burden from the Commissioner. In reality, however, Toussaint's failure to convince the tax court that he owned a Picasso, a failure forced upon him by the Commissioner's cross-examination and evidence, constitutes the Commissioner's success in discharging his burden here. Finally, as we noted above, Toussaint's credibility on the stand is critical, if not congruent, to his honesty on the tax return, and we are loathe to second-guess the tax court's evaluation of that credibility.

The tax court applied the correct standard to the evidence, *Toussaint*, 47 T.C.M. at 916, which was reviewed by the court at length. After a thorough examination of the record, we find no clear error in the tax court's conclusions. On the contrary, we are convinced that a finding of no fraud in this instance would have left us "with the definite and firm conviction that a mistake [had] been committed." *U.S. Gypsum, supra*. Therefore, we affirm.

AFFIRMED.

---

**12.** *See Cirillo v. Commissioner*, 314 F.2d 478, 482 (3rd Cir.1963).