**Michael A. SCHAFFER and Jennifer Schaffer, Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 1094, Docket 83–4100.

United States Court of Appeals, Second Circuit.

Argued April 25, 1985.

Decided Dec. 16, 1985.

Howard L. Mann, New York City (Donald A. Pitofsky, Schwartzman Weinstock Garelik & Mann, P.C., New York City, on brief), for petitioners-appellants.

William S. Estabrook, Tax Div., Dept. of Justice, Washington, D.C. (Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Martha B. Brissette, Tax Div., Dept. of Justice, Washington, D.C., on brief), for respondent-appellee.

Before FEINBERG, Chief Judge, FRIENDLY and NEWMAN, Circuit Judges.

JON O. NEWMAN, Circuit Judge.

This appeal poses vexing questions concerning the income tax liability of an individual who participates with others in income-generating activity. The questions arise in an appeal by Michael A. Schaffer and his wife [1] from a judgment of the Tax Court (Irene F. Scott, Judge) determining a deficiency in their 1969 federal income tax of $159,807.69 and assessing against Schaffer a fraud penalty of $79,903.85. *See Mandina v. C.I.R.*, 43 T.C.M. (CCH) 359 (1982). For reasons that follow, we affirm only in part and remand for entry of a modified judgment.

### The Legal Framework

■ Before introducing the facts, it will be helpful to outline the nature of the problem. One who participates with others in a joint enterprise may be held criminally and civilly liable for all the actions taken by any participant in furtherance of the venture. *See, e.g., Pinkerton v. United States*, 328 U.S. 640, 645–47, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946) (criminal); W. Prosser & W. Keeton, *The Law of Torts* § 46 (5th ed. 1984) (civil). However, courts have recognized that the vicarious liability principles of criminal and tort law are not fully applicable to determinations of individual liability for income taxes. *See Llorente v. C.I.R.*, 649 F.2d 152, 156–57 (2d Cir.1981); *cf. De Cavalcante v. C.I.R.*, 620 F.2d 23, 27–28 (3d Cir.1980); *Weimerskirch v. C.I.R.*, 596 F.2d 358, 361–62 (9th Cir.1979); *Carson v. United States*, 560 F.2d 693, 697–98 (5th Cir.1977); *Gerardo v. C.I.R.*, 552 F.2d 549, 554–55 (3d Cir.1977); *Pizzarello v. United States*, 408 F.2d 579, 583–84 (2d Cir.), *cert. denied*, 396 U.S. 986, 90 S.Ct. 481, 24 L.Ed.2d 450 (1969).

■ The distinction reflects the different purposes of the various legal liabilities.

---

**1.** Schaffer's wife was named in the notice of deficiency only because she had filed a joint return with her husband in 1969. She was not found liable for the fraud penalty.

Criminal law and tort law provide redress for wrongs and properly impose upon each person who joins with others to perpetrate a crime or cause tortious injury full liability for all actions taken in furtherance of the venture he has joined. The extent to which the burden of this full responsibility should be individually assessed is determined in diverse ways. In criminal law the sentencing judge endeavors to scale punishments to reflect, among other things, the relative degrees of culpability of the wrongdoers. In tort law, the victims decide, by drafting a complaint and enforcing a judgment, which of the wrongdoers to sue and to hold accountable, and legislatures decide, by enacting contribution statutes, whether to modify the victims' choice by permitting those held liable to share their burden with joint tort-feasors. By contrast, income tax laws seek to fix individual responsibility for taxes on a person's income. Generally a person is taxed only on his own income. When he participates with others in a joint enterprise, he is liable, under partnership tax principles, for the tax only on his proportionate share of the enterprise's income (determined by the participants' agreement or by their interests in the enterprise), *see* I.R.C. §§ 702, 704, and a joint enterprise or joint venture may be found to be a partnership for tax purposes, *see, e.g., Burde v. C.I.R.*, 352 F.2d 995, 1002 (2d Cir.1965), *cert. denied*, 383 U.S. 966, 86 S.Ct. 1271, 16 L.Ed.2d 307 (1966).

▌ There are, however, circumstances under which the Commissioner of Internal Revenue is entitled to charge a participant in income-generating activity with a greater share of the income of the enterprise. This occurs when the nature of an enterprise's operation precludes ascertainment of either the identities of those who shared the income or the percentages of their proportionate interests. The income

may arise from an ongoing activity, *e.g., Gerardo v. C.I.R., supra* (gambling business), or may result from a specific transaction, *e.g., Cannon v. C.I.R.*, 533 F.2d 959 (5th Cir.1976) (proceeds of an embezzlement), *cert. denied*, 430 U.S. 907, 97 S.Ct. 1177, 51 L.Ed.2d 583 (1977). In such circumstances, the untraced income has been either prorated equally among all the participants,[2] *e.g., id.* (one-half of embezzlement proceeds allocated equally as income to each of two participants); *Barber v. C.I.R.*, 39 T.C.M. (CCH) 1026 (1980) (one-seventh of bank robbery proceeds allocated equally as income to each of seven participants), *aff'd without opinion*, 679 F.2d 896 (9th Cir.1982), or attributed in full to each of the participants, *e.g., Gerardo v. C.I.R., supra; Stone v. United States*, 405 F.Supp. 642 (S.D.N.Y.1975), *aff'd mem.*, 538 F.2d 314 (2d Cir.), *cert. denied*, 429 U.S. 921, 97 S.Ct. 317, 50 L.Ed.2d 288 (1976). In the latter event, the Commissioner is limited, however, to collection of only a single tax on the unapportioned income. *See Gerardo v. C.I.R., supra; Stone v. United States, supra.*

When untraced funds are attributed as income to all participants, either with or without proration, it becomes important to determine the scope of the venture that generated the income in question. The choice, as in this case, is between viewing the venture broadly and attributing all of the untraced income to all of the participants or viewing the venture more narrowly as a series of discrete transactions and attributing the untraced income from each transaction only to the participants in that transaction. Whether the venture is viewed broadly or narrowly, a further problem arises where only some of the income is untraced. For example, the evidence might show that four persons robbed a bank, $1 million was taken, and one partici-

---

**2.** The equal proration of income among those participating in the activity that generated the income has been somewhat imprecisely referred to, in the context of an equal division between two participants, as a "Solomon-like decision ... to cut the baby in half." *See Cannon v. C.I.R., supra,* 533 F.2d at 960. Of course, the

wisdom of King Solomon's decision was that it only threatened to divide the baby, thereby precipitating identification of the true mother—the claimant who relinquished her claim in the face of the threatened division. *See* I Kings 3:16–28. In *Cannon,* as in the pending case, the Tax Court made an actual division.

pant pocketed $100,000. The untraced $900,000 could be attributed (with or without proration) to all four participants, or the entire $1 million could be attributed (with or without proration) to all four participants, or the untraced $900,000 could be attributed (with or without proration) to the three participants not shown to have received any specific sum on the theory that the $100,000 was the entire share of the participant who received it.[3] One's view of the fairness of these alternatives may vary depending on whether the amount of the traced funds was less than, equal to, or greater than a pro rata share of the total funds taken. In this case, as will be seen, the Commissioner and then the Tax Court used a combination of these approaches in determining what amount of funds, generated by activities in which Schaffer allegedly participated, should be attributed to him as taxable income.

### The Facts

In 1978, the Commissioner issued a notice of deficiency to Schaffer indicating that he owed $674,505 in income taxes for 1969 plus $337,252 in fraud penalties, imposed pursuant to 26 U.S.C. § 6653(b) (1982). Similar notices were issued to Philip J. Mandina, Roy I. O'Nan, and Dana Mitchell. The notices of deficiency were premised on the allegation that these three men, along with Schaffer, (collectively the "conspirators" or the "participants") had engaged in a conspiracy "which had, as one of its objectives, the defrauding of Harriet Pierce of a substantial portion of her wealth." Answer at 2, *Schaffer v. C.I.R.*, No. 3565–78 (U.S. Tax Court 1983). Harriet Pierce is an heiress to the Woolworth fortune. In June 1969, she married Mitchell; the couple was divorced in 1970. We will refer to her throughout by her maiden name. The vehicle of the alleged conspiracy was D. Mitchell Investments, Inc. ("DMI"), a Florida corporation founded by Mitchell in April 1969 with the assistance of Mandina. Upon the incorporation of DMI, Pierce transferred over $2.6 million of her assets to the corporation.

Nearly all of the deficiency consisted of taxes and penalties due with respect to income allegedly derived by the conspirators from a series of six transactions. The Commissioner contended and the Tax Court found that the conspirators engaged in these six transactions to divert to their personal use funds invested by Pierce in DMI. The total sum diverted in the six transactions was $848,000. The Commissioner included this aggregate sum as taxable income of Schaffer. The Commissioner also included this same sum as taxable income of Mandina and O'Nan. This sum, less $300,000, was also included as taxable income of Mitchell.[4] In addition, $52,700 was included as income only of Schaffer.

**3.** The results of the various choices, for the example given in the text, would be as follows:

| | Addition to taxable income of each of four participants (with "A" pocketing $100,000) | | | |
|---|---|---|---|---|
| | A | B | C | D |
| attributing $900,000 to four participants with proration | $325,000 | $225,000 | $225,000 | $225,000 |
| attributing $900,000 to four participants without proration | $1,000,000 | $900,000 | $900,000 | $900,000 |
| attributing $1,000,000 to four participants with proration | 250,000 | 250,000 | 250,000 | 250,000 |
| attributing $1,000,000 to four participants without proration | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 |
| attributing $900,000 to three participants with proration | 100,000 | 300,000 | 300,000 | 300,000 |
| attributing $900,000 to three participants without proration | 100,000 | 900,000 | 900,000 | 900,000 |

**4.** The $300,000 net proceeds from a $400,000 DMI check payable to Harriet Pierce, after Mitchell had received $100,000, was charged to

This sum comprised three elements: a $17,000, DMI check to Schaffer claimed by him to be a DMI loan to a New York restaurant known as "Brian & Mike's," in which Schaffer and his wife owned a controlling interest; a $30,000 DMI check to Schaffer, also claimed to be a loan, and unreported legal fees of $5,700. Other sums, individually calculated, were added only to the income of the particular conspirator claimed to have received such sums. The Tax Court substantially revised the Commissioner's approach, charging each conspirator with only a pro rata (one-fourth) share of the aggregate sum found to have been diverted,[5] and then adding the same specific income items attributed by the Commissioner only to individual conspirators. The total income thereby attributed to Schaffer (one-fourth of the aggregate sum plus individual items) resulted in additional tax due of $159,807.69.

The first of the six transactions involved the purchase by DMI of Black Caesar's Forge restaurant from Ruth Casey. The purchase was accomplished in two installments. Prior to the incorporation of DMI, Casey transferred ownership of Black Caesar's Forge to DuPont Properties, Inc., a corporation Mitchell had formed for the purpose of acquiring the restaurant. Mitchell retained 51% of DuPont Properties; Casey received 49%. Mitchell, Schaffer, and Mandina discussed the purchase with Pierce and convinced her to advance $175,000 to DuPont Properties. These funds were deposited in Mandina's personal checking account. Mandina then made a number of disbursements, including $8,750 to Schaffer as a "finder's fee." Schaffer reported this sum on his 1969 income tax return.

The sale of the restaurant was completed through the purchase by DMI of Casey's interest in DuPont Properties. DMI issued four checks to Casey in late April and early May 1969: one for $100,000, one for $50,000, and two for $25,000. O'Nan assisted Casey in converting the checks into cash. Although Casey later signed a receipt for $200,000, the Tax Court credited her testimony that she never read the receipt and actually received only $100,000 for the purchase of her interest in DuPont Properties. The $100,000 difference between the $100,000 received by Casey and the $200,000 allegedly disbursed by DMI to purchase the restaurant (DuPont Properties) was charged to each conspirator as unreported income during 1969.

The second transaction specified in the notice of deficiency was the conspirators' diversion of $400,000 Pierce gave to Mitchell as a wedding gift. On the day before Pierce and Mitchell were married, Milton W. Carr, Jr., an associate of Mandina's and an officer of DMI, issued a DMI check to Pierce in the amount of $400,000. Pierce deposited this check in a personal checking account and drew two checks on that account, one for $100,000 payable to Mitchell and one for $300,000 payable to cash. The latter check was exchanged for a cashier's check in the same amount. Mitchell and Pierce, who were accompanied by O'Nan and Carr during these transactions, went that same day to another bank and converted the cashier's check into $300,000 cash. Mitchell deposited Pierce's check for $100,000 in his personal checking account; the Tax Court determined that the other three conspirators shared the remaining $300,000. The Commissioner charged each conspirator except Mitchell with $300,000 unreported income during 1969.

The third transaction—the one in which Schaffer was most heavily involved—was the purchase in August 1969 of the stock of Sooner State Oil Co., Inc. ("Sooner"). Schaffer located Sooner, a publicly held corporation with neither assets nor liabilities, and negotiated the purchase of 344,-

---

each of the other three conspirators, but not to Mitchell, who was charged only with the $100,000 that was traced directly to him. This is the "second transaction" described below.

5. The $300,000 net proceeds from the Harriet Pierce check for $400,000 (*see* note 4, *supra* ) was prorated only among Schaffer, Mandina, and O'Nan, since Mitchell had already been charged with $100,000 from this transaction.

500 shares of this shell corporation for $35,000. Rather than have DMI purchase these shares directly, the conspirators paid $3,000 to Stefano Brandino, who purchased the Sooner shares for $35,000 and resold them to DMI for $260,000. Schaffer, Mitchell, and Mandina were present in Mandina's office when the documents effecting these sales were signed. Schaffer brought $35,000 cash to the closing in a paper bag.

In October 1969, Schaffer brought about $225,000 in cash in a briefcase to the apartment where Mitchell kept a prostitute, Terry Timme. Timme testified that the next day Mitchell, Schaffer, Mandina, and O'Nan met at the apartment and discussed a shell company. At one point in the conversation, someone mentioned taking the cash to Mandina's office. Later that day Mandina left with the cash in a briefcase. The Commissioner charged each conspirator with $225,000 in unreported income during 1969.

The fourth transaction related to BLW International Film Shorts and Features, Ltd. ("BLW"), a corporation formed by Schaffer and two others to purchase and distribute foreign films in the United States. DMI provided the operating capital for BLW by issuing three checks totaling $125,000, which were deposited by Schaffer. A check for $20,000 and one for $35,000 were made payable to Schaffer and deposited in his personal bank account; a third check for $70,000 payable to BLW was endorsed by Schaffer as treasurer of BLW and deposited in the company's account. The Tax Court found that the $30,000 was originally recorded in DMI's books as a loan to Schaffer but was later shown as an advance to Sooner; the $35,000 was treated as an advance to BLW. In 1970, DMI's books were adjusted at Schaffer's instruction to show $51,000 of the amount represented by the three checks as a bad debt of Sooner. As of May 11, 1970, DMI's records contained no documentation of these transactions or any notes receivable representing any of the $125,000 involved. The Commissioner charged each conspira-

tor with $125,000 in unreported income during 1969.

The fifth transaction involved the purchase by DMI of Trans-Florida Assurance Agency, Inc. ("Trans-Florida"). In October 1969, Carr drew a DMI check for $53,000 payable to Margaret Machen, part owner of Trans-Florida. Carr accompanied Machen to a bank where the check was cashed; Carr put the currency in a briefcase. Machen transferred her stock in Trans-Florida to DMI upon the delivery of $15,000 of the cash to a representative of Trans-Florida in payment of corporate obligations. Carr signed a receipt prepared by a relative of Machen's for the remaining $38,000 cash. DMI eventually wrote off $192,727.48, including the $53,000 check to Machen, as a worthless investment in Trans-Florida. The Commissioner charged each conspirator with $38,000 unreported income in 1969.

The last of the transactions allegedly done in furtherance of the conspiracy involved a $60,000 loan to Mitchell from DMI. In December 1969, DMI issued a $60,000 check to Mitchell. The check bore the notation "loan" and was converted into cash a day after being issued. The $60,000 was initially classified on DMI's books as an escrow item in Mitchell's account, was reclassified as being used to purchase Sooner stock, and eventually was written off as part of DMI's investment in Trans-Florida. The Commissioner charged each of the conspirators with $60,000 unreported income in 1969.

In addition to the items charged to each of the conspirators, the notice of deficiency issued to Schaffer included unreported income charged only to him. The first additional item related to a $17,000 check issued by DMI to Schaffer in May 1969. This check was treated by DMI as an advance to "Michael A. Schaffer individually" and was deposited in Schaffer's personal bank account. This advance was later recharacterized as an advance to Brian and Mikes, Inc., a corporation 75% owned by Schaffer and his wife. When Brian and Mikes experienced financial trouble and

was sold to a third party, the $17,000 obligation was not assumed by the buyer and DMI made no attempt to collect the loan.

The Commissioner also charged Schaffer with $30,000 unreported income from DMI. In August 1969, Mitchell issued a $30,000 DMI check to Schaffer. On its books, DMI treated the check as a loan to Schaffer. In 1971, however, DMI offset the loan against a $30,000 attorney's fee owed to Schaffer. Schaffer reported $30,000 on his 1971 income tax return as "foregiveness of debt." Finally, the notice of deficiency charged Schaffer with $5,700.81 in unreported legal fees.

Schaffer brought suit in the Tax Court challenging the notice of deficiency. His case was consolidated with those of Mandina, Mitchell, and O'Nan. The consolidated cases were tried in Miami, Florida. The Tax Court upheld Schaffer's liability on the theory that he had been part of an agreement to extract funds from DMI. The Tax Court noted: "Whether in the technical sense respondent has shown a conspiracy among petitioners is of little importance in this case since the record clearly establishes that petitioners did have an agreement among themselves to extract money from DMI for their own benefit, and that they did so." *Mandina v. C.I.R., supra,* 43 T.C.M. (CCH) at 371. Though purporting to find an agreement among all four participants to extract money from DMI, the Tax Court did not attribute income to the participants as if there had been one overall scheme to extract funds from DMI. Instead, following the Commissioner's approach (though modifying for proration), the Tax Court gave separate consideration to each of the six transactions that generated untraced funds.

Moreover, again following the Commissioner, the Tax Court did not apply a consistent approach in attributing income from the six transactions to the four participants. In fact four approaches were used by the Commissioner, without explicit recognition of the variations involved: (a) For one transaction in which no funds were traced to any participant, the total of un-traced funds was attributed to all four participants. This was done for the $38,000 of cash remaining from the $53,000 DMI check. (b) For three transactions in which a portion of funds was traced to one of the participants, the entire amount of the transaction was attributed to all four participants without any deduction for the amount individually received. Thus, the entire $225,000 in cash from the Sooner transaction was attributed to all four, even though Mandina left the meeting with all the cash; the entire $125,000 total of checks in the BLW transaction was attributed to all four, even though two checks totaling $55,000 were made out to Schaffer and deposited in his personal account; and the entire $60,000 check for the alleged loan to Mitchell was attributed to all four, even though the check was made out to Mitchell and cashed. (c) For one transaction in which a portion of the funds was traced to individual participants, only the untraced funds were attributed to all four participants. Thus, $100,000 of untraced funds from the Black Forge transaction was attributed to all four, though Schaffer was shown to have received, in addition, $8,750, and others were also shown to have received specific sums. (d) Finally, for one transaction in which a portion of the funds was traced to one of the participants, the untraced funds were attributed only to the other three participants. Thus, $300,000 of the untraced cash from the $400,000 wedding gift was attributed to three participants, with Mitchell charged only for the $100,000 that was deposited in his personal checking account.

The Tax Court modified the Commissioner's calculations only by prorating the income from each transaction among the participants, attributing one-fourth of the attributed funds in each transaction (some traced, some untraced) to each of the four participants, except in the wedding gift transaction in which the untraced $300,000 was prorated among three participants. With this modification, the Tax Court determined a deficiency against Schaffer of $159,807.69 and a 50% fraud penalty on this amount of $79,903.85. Schaffer appealed

the Tax Court's judgment to this Court. By stipulation, Schaffer's appeal was withdrawn without prejudice pending Mandina's appeal of the same judgment to the Eleventh Circuit, which affirmed. *See Mandina v. C.I.R.*, 758 F.2d 1399 (11th Cir.1984).[6]

### Discussion

■ Initially we must consider the procedural issues arising from the fact that the notice of deficiency was issued to Schaffer long after the running of the general three-year statute of limitations governing income tax liability cases. *See* 26 U.S.C. § 6501(a) (1982); *Bryan v. C.I.R.*, 209 F.2d 822, 825 (5th Cir.1954), *cert. denied*, 348 U.S. 912, 75 S.Ct. 289, 99 L.Ed. 715 (1955). False or fraudulent returns filed with an intent to evade tax, of course, are not subject to the general three-year limitation. 26 U.S.C. § 6501(c)(1); *Kreps v. C.I.R.*, 351 F.2d 1, 4 (2d Cir.1965). The burden of proving that a false or fraudulent return was filed with intent to evade tax is on the Commissioner, 26 U.S.C. § 7454(a), and such proof must be made by clear and convincing evidence, *Toussaint v. C.I.R.*, 743 F.2d 309, 312 (5th Cir.1984); *Webb v. C.I.R.*, 394 F.2d 366, 377–78 (5th Cir.1968); *see generally* 9 J. Mertens, *Mertens Law of Federal Income Taxation* § 50.67 (1982). Because there is rarely direct proof of fraudulent intent, however, the Commissioner can sustain this burden by introducing circumstantial evidence. *Toussaint v. CIR, supra*, 743 F.2d at 312. Finally, if the Commissioner succeeds in proving that any part of the deficiency in income tax paid is the result of fraud, the 50% fraud penalty can be applied to the entire deficiency. *O'Connor v. C.I.R.*, 412 F.2d 304, 310 (2d Cir.1969), *cert. denied*, 397 U.S. 921, 90 S.Ct. 908, 25 L.Ed.2d 102 (1970).

■ We are satisfied that the Commissioner has met this initial burden. The Commissioner introduced clear and convincing evidence of Schaffer's involvement in

the Sooner stock purchase. This fraudulent transaction netted the conspirators $225,000. Evidence introduced at trial placed Schaffer in possession of about this amount of cash two months later, at which time he and the other conspirators discussed a shell corporation. This constitutes sufficient circumstantial evidence to support a reasonable inference that Schaffer received unreported income from the Sooner transaction and that he intended to evade tax by filing his tax return for 1969 without declaring such income. *Cf. Estate of Temple v. C.I.R.*, 67 T.C. 143, 161 (1976). The Commisioner need show no more to support the Tax Court's determination that Schaffer acted with intent to evade taxation, for this determination is a factual finding subject only to the "clearly erroneous" standard of review, *see Toussaint v. C.I.R., supra*, 743 F.2d at 312; *Webb v. C.I.R., supra*, 394 F.2d at 378. Because we are not left with "the definite and firm conviction that a mistake has been committed," *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), we affirm this finding of fact and uphold the 50% fraud penalty for those items of the notice of deficiency affirmed below.

■ Our determination that the notice of tax deficiency issued against Schaffer is not barred by the statute of limitations shifts to him the burden of proof regarding the correctness of the deficiency. A notice of tax deficiency carries a presumption of correctness that requires the taxpayer to demonstrate that the deficiency is incorrect. *Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); *see generally* 9 J. Mertens, *Mertens Law of Federal Income Taxation* § 50.61. In the typical case, there are two aspects to this presumption of correctness: the procedural burden of going forward with the evidence and the substantive burden of persuasion. *Rockwell v. C.I.R.*, 512 F.2d 882, 885 (9th Cir.), *cert. denied*, 423 U.S. 1015,

6. O'Nan initially appealed to the Eleventh Circuit and then withdrew his appeal. Mitchell apparently never sought to appeal.

96 S.Ct. 448, 46 L.Ed.2d 386 (1975). The taxpayer generally must prove the notice of deficiency incorrect by a preponderance of the evidence. *See Carson v. United States, supra,* 560 F.2d at 695–96; *Lesser v. United States,* 368 F.2d 306, 310 (2d Cir.1966) (in banc); *United States v. Lease,* 346 F.2d 696, 700 (2d Cir.1965).

There are two aspects of this case that may alter somewhat the typical allocation of the burden of proof: (a) Schaffer is called upon to prove a negative—that he did not receive the income charged in the notice of deficiency, and (b) the Commissioner has introduced no evidence that Schaffer received much of the income listed in the notice of deficiency. This Court has noted that placing upon the taxpayer the burden of proving that he did not receive illegal income is "unfair" and sometimes "impossible." *Llorente v. C.I.R., supra,* 649 F.2d at 156. The Sixth Circuit has gone a step further, indicating that the law "imposes much less of a burden upon a taxpayer who is called upon to prove a negative—that he did not receive the income which the Commissioner claims—than it imposes upon a taxpayer who is attempting to sustain a deduction on his income tax return." *Weir v. C.I.R.,* 283 F.2d 675, 679 (6th Cir.1960). When a taxpayer is called upon to prove nonreceipt of income, the Sixth Circuit will, upon "[r]easonable denials of the assessment's validity," *United States v. Besase,* 623 F.2d 463, 465 (6th Cir.), *cert. denied,* 449 U.S. 1062, 101 S.Ct. 785, 66 L.Ed.2d 605 (1980), shift back onto the Commissioner the burden of proving the correctness of the deficiency. *Id.; see United States v. Janis,* 428 U.S. 433, 441–42 & nn. 9, 10, 96 S.Ct. 3021, 3026 & nn. 9, 10, 49 L.Ed.2d 1046 (1976) (difference of opinion among the circuits regarding whether burden of proof shifts to Commissioner upon introduction of evidence that assessment is incorrect); 9 J. Mertens, *Mertens Law of Federal Income Taxation* § 50.61, at 196.

We need not decide in this case whether, when called upon to prove a negative, the taxpayer's satisfaction of the burden of going forward shifts onto the Commissioner the ultimate burden of persuasion.[7] It suffices here to rely on precedents indicating that the presumption of correctness normally afforded the Commissioner's notices of deficiency does not attach to a notice unsupported by any evidence. The Supreme Court has held that when the Commissioner relies upon a " 'naked' assessment without *any* foundation whatsoever," that notice of deficiency is "not properly subject to the usual rule with respect to the burden of proof in tax cases." *United States v. Janis, supra,* 428 U.S. at 441, 96 S.Ct. at 3026 (citations omitted). As this Court has put it, the presumption of correctness enjoyed by a notice of tax deficiency "is only as strong as its rational underpinnings. Where [a notice of deficiency] lacks a rational basis the presumption evaporates." *Llorente v. C.I.R., supra,* 649 F.2d at 156; *see De Cavalcante v. C.I.R., supra,* 620 F.2d at 27–28; *Weimerskirch v. C.I.R., supra,* 596 F.2d at 361–62; *Carson v. United States, supra,* 560 F.2d at 696; *Gerardo v. C.I.R., supra,* 552 F.2d at 554.

Invoking this line of cases, Schaffer argues that the Commissioner has failed to produce any evidence linking him to several of the six income-generating transactions set forth in the notice of deficiency and therefore that no presumption of correctness should attach to these items. The Commissioner responds by arguing that Schaffer was part of a conspiracy to defraud DMI and that each of the six income-generating transactions at issue in this case was in furtherance of that conspiracy.

7. At least one opinion in this Circuit has said that the presumption of correctness "is not evidence itself and disappears upon the introduction of evidence to overcome it." *Pizzarello v. United States, supra,* 408 F.2d at 583. To the extent that this statement can be read to place the ultimate burden of proof in tax collection cases on the Commissioner, it may have been undermined by language in *United States v. Janis, supra,* in which the Supreme Court assumed without deciding that the burden of proof in collection cases, like that in refund cases, is on the taxpayer. 428 U.S. at 440–41, 96 S.Ct. at 3025–26.

Invoking the general principle that a conspirator can be held liable for the acts of his co-conspirators, *see, e.g., United States v. Arbelaez,* 719 F.2d 1453, 1459 (9th Cir. 1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3543, 82 L.Ed.2d 847 (1984); *Halberstam v. Welch,* 705 F.2d 472, 477 (D.C.Cir.1983); *Chemetron Corp. v. Business Funds, Inc.,* 682 F.2d 1149, 1180 (5th Cir.1982), *vacated* 460 U.S. 1007, 103 S.Ct. 1245, 75 L.Ed.2d 476, *reinstated in relevant part,* 718 F.2d 725, 728 (5th Cir.1983), the Commissioner argues that Schaffer should be liable for a pro rata share of the income attributable to the conspiracy.

In this case, had the Commissioner and the Tax Court treated the various transactions as part of one overall venture by the four participants to obtain funds from DMI or from Harriet Pierce and aggregated only the untraced funds diverted from the venture, we would have to decide whether there was sufficient evidence to invoke a presumption of correctness to a determination that Schaffer was sufficiently a participant in a venture of such scope to warrant attributing to him a pro rata share of all untraced funds. However, neither the Commissioner nor the Tax Court has approached the matter that way. Instead of attributing to all four participants one fourth of all untraced funds, they have given separate consideration to each of six transactions, and, as we have seen, applied different approaches in deciding what amount of income generated from each transaction, including traced and untraced funds, should be attributed to the participants in each transaction. Our review will follow the specific transaction approach on which the Tax Court judgment is based. We must therefore determine whether the evidence suffices to invoke a presumption of correctness as to the amount of income attributed to Schaffer in each of the six transactions.

 The evidence suffices as to the Black Forge and Sooner transactions and part of the BLW transaction. Schaffer was among those meeting with Pierce and urging her to advance $175,000 to complete the purchase of the restaurant. He was properly charged with a one-fourth share of the untraced $100,000 of cash. There is also substantial evidence of Schaffer's role in the Sooner transaction. The problem here is that the $225,000 pro rated among the four participants is arguably not untraced funds, since the evidence showed that Mandina took the cash with him when he left Timme's apartment. However, the evidence permitted the Commissioner and the Tax Court to conclude that Mandina was merely a temporary custodian, transporting the cash to his office for a four-way split among the four participants who had just previously discussed the entire transaction. As for the BLW transaction, there is no doubt of Schaffer's involvement nor of his receipt and deposit in his personal account of $55,000 of the $125,000 that was prorated. However, there is no evidence that Schaffer received any of the $70,000 check that was payable to BLW and deposited in the company's account, and he should not have been charged with one-fourth of this sum. The $55,000 he did receive could have been attributed solely to Schaffer, but the Commissioner has not contended that the Tax Court erred in charging Schaffer with only a pro rata share.

 Attribution of a prorated share to Schaffer was not warranted as to the remaining three transactions. There is no evidence that Schaffer had any participation in the transaction whereby Trans Florida was acquired, leaving $38,000 in cash unaccounted for, the transaction whereby a $60,000 check was written to Mitchell, or the wedding gift transaction. The fact that Mitchell received $100,000 from the $400,000 wedding gift creates the suspicion, as a matter of arithmetic, that the remaining $300,000 was divided three ways. However, Schaffer was not shown to have had any participation in the events surrounding the wedding gift transaction. Those shown by the evidence to have been involved were Mitchell, O'Nan, and Mandina's associate, Carr. The arithmetic would be as neat if O'Nan, Carr, and Mandina had

divided the $300,000. Or, for all the evidence shows, Mitchell may have ended up with the entire $400,000. In any event, there is no evidence of Schaffer's participation.

In examining the record for evidence that might link Schaffer to each of the six transactions, we note two salient differences between his case and that of Mandina, as to whom the Tax Court judgment has been affirmed. *See Mandina v. C.I.R., supra.* First, the Tax Court heard testimony from Timme that Mandina had told her that "he was running this whole show." There was no evidence of a comparable leadership role attributed to Schaffer. Second, Mandina was shown to have made large cash purchases. No similar evidence was produced with respect to Schaffer. *See Weimerskirch v. C.I.R., supra,* 596 F.2d at 362 (emphasizing significance of the lack of such evidence).

 Finally, Schaffer challenges two items of unreported income charged only to him: the $17,000 and $30,000 loans from DMI. Although it is a close question, we cannot overrule the Tax Court's determination that the $17,000, claimed to be a DMI loan to "Brian & Mike's," should have been declared as income of Schaffer. The bookkeeping of this loan was suspect, as was the fact that, though all of "Brian & Mike's" other financial obligations were undertaken by its purchaser, the alleged loan from DMI was not. These facts support the inference that Schaffer, not "Brian & Mike's," received the proceeds of the "loan." However, we do not uphold the Tax Court's determination that the $30,000 DMI check to Schaffer in August 1969 was unreported income. Schaffer testified that this loan of $30,000 was offset in 1971 by legal fees he rendered to DMI. He report-

ed this amount on his 1971 income taxes as forgiveness of debt.[8] This recognition of income occurred before the investigation into the events surrounding this case had begun, supporting Schaffer's claim that he reported the sum in good faith and not simply to shift income from 1969 to 1971. Under these circumstances, we are left with the definite impression that a mistake has been committed in holding Schaffer liable for the $30,000.

In sum, we conclude that the determination of Schaffer's unreported income must be revised to exclude the one-third prorated share of the wedding gift ($100,000), the one-fourth prorated share of the $70,000 check to BLW ($17,500), the one-fourth prorated share of the $38,000 cash from the Trans Florida transaction ($9,500), the one-fourth prorated share of the $60,000 loan to Mitchell ($15,000), and the entirety of the $30,000 DMI loan to Schaffer ($30,000). The net result is a reduction in taxable income of $172,000. Upon remand, the Tax Court shall determine the taxes and penalties owed with respect to the income as recalculated.[9]

The judgment of the Tax Court is affirmed to the extent indicated and the cause remanded to the Tax Court for entry of a modified judgment consistent with this opinion. No costs.

---

**8.** The Tax Court found that the record "does not show what services Mr. Schaffer rendered to DMI for these alleged attorney fees and the inference is that this change in the books [from the loan to a charge for attorney's fees] was made at Mr. Schaffer's directions." *Mandina v. C.I.R., supra,* 43 T.C.M. (CCH) at 372. This finding does not undermine the bona fides of a 1969 loan. There is no evidence that Schaffer's circumstances changed in a way that made

$30,000 of income subject to less tax in 1971, when he reported the income, than in 1969.

**9.** We have also considered and rejected as without merit Schaffer's contention that the Tax Court erred in not reopening the case for presentation of testimony of one of Schaffer's coventurers in the BLW enterprise.